UNITED STATES *v.* 50 ACRES OF LAND ET AL.

No. 83–1170.   Argued October 2, 1984—Decided December 4, 1984

Stevens, J., delivered the opinion for a unanimous Court. O'Connor, J., filed a concurring opinion, in which Powell, J., joined, *post*, p. 37.

*Joshua I. Schwartz* argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Habicht, Deputy Solicitor General Claiborne, Deputy Assistant Attorney General Liotta, Raymond N. Zagone, Dirk D. Snel,* and *Thomas H. Pacheco.*

*H. Louis Nichols* argued the cause for respondents.[*]

JUSTICE STEVENS delivered the opinion of the Court.

The Fifth Amendment requires that the United States pay "just compensation"—normally measured by fair market value[1]—whenever it takes private property for public

---

[*]Briefs of *amici curiae* urging affirmance were filed for the Council of State Governments et al. by *Lawrence R. Velvel* and *Elaine Kaplan;* and for Open Lands Project et al. by *Young Kim, Ruth E. Van Demark, George W. Overton, T. S. L. Perlman,* and *Adam Yarmolinsky.*

[1] *United States* v. *Miller,* 317 U. S. 369, 374 (1943) ("what a willing buyer would pay in cash to a willing seller").

use.[2]  This case involves the condemnation of property owned by a municipality.  The question is whether a public condemnee is entitled to compensation measured by the cost of acquiring a substitute facility if it has a duty to replace the condemned facility.  We hold that this measure of compensation is not required when the market value of the condemned property is ascertainable.

I

In 1978, as part of a flood control project, the United States condemned approximately 50 acres of land owned by the city of Duncanville, Texas.[3]  The site had been used since 1969 as a sanitary landfill.  In order to replace the condemned landfill, the city acquired a 113.7-acre site and developed it into a larger and better facility.[4]  In the condemnation proceedings, the city claimed that it was entitled to recover all of the costs incurred in acquiring the substitute site and developing it as a landfill, an amount in excess of $1,276,000. The United States, however, contended that just compensation should be determined by the fair market value of the

---

[2] "[N]or shall private property be taken for public use, without just compensation."  U. S. Const., Amdt. 5.

[3] The United States initiated the condemnation proceedings by filing a declaration of taking under 40 U. S. C. § 258a.  Under that procedure the Government deposits the estimated value of the land in the registry of the court.  "Title and right to possession thereupon vest immediately in the United States.  In subsequent judicial proceedings, the exact value of the land (on the date the declaration of taking was filed) is determined, and the owner is awarded the difference (if any) between the adjudicated value of the land and the amount already received by the owner, plus interest on that difference."  *Kirby Forest Industries, Inc.* v. *United States,* 467 U. S. 1, 5 (1984).

[4] The new landfill site is larger in acreage than the old facility and because of superior soil and water table conditions it can be excavated to a greater depth.  As a result, the capacity of the new facility is 2,100,000 cubic yards while the remaining capacity of the old facility was 650,000 cubic yards.  The new facility is expected to remain in service for 41.6 years, or 28.8 years longer than the condemned facility would have remained in service.  Tr. 395–397, 399, 402.

condemned facility and deposited $199,950 in the registry of the court as its estimation of the amount due.

Before trial the Government filed a motion *in limine* to exclude any evidence of the cost of the substitute facility, arguing that it was not relevant to the calculation of fair market value. Record, Doc. No. 62. The District Court denied the motion, noting that this Court had left open the question of the proper measure of compensation for the condemnation of public property. See *United States* v. *564.54 Acres of Land,* 441 U. S. 506, 509, n. 3 (1979) *(Lutheran Synod).* The court concluded that "a complete factual record should be developed from which an independent determination of the appropriate measure of compensation can be made." Record, Doc. No. 111.

At trial, both parties submitted evidence on the fair market value of the condemned property[5] and on the cost of the substitute landfill facility.[6] Responding to special interrogatories, the jury found that the fair market value of the

---

[5] Experts for both the United States and the city agreed that a market for landfill properties existed in the area. A Government witness, for example, testified that there are "private owners of solid waste companies in the market for land for their own solid waste disposal sites. You've got the major corporations in the marketplace securing sites for landfill operations and then you've got all of your City Governments, they're seeking locations to deposit solid waste. And all of these people at one time or another are in the marketplace looking for a site for solid waste disposal." *Id.*, at 297.

Based on their evaluation of the recent sale prices of comparable parcels, the experts for the city estimated the value of the condemned facility as between $367,500 and $370,000; experts for the United States estimated its value as between $160,410 and $190,000. *Id.*, at 173, 182, 276, 353.

[6] The city's Director of Public Works admitted on cross-examination that the city had condemnation powers, but did not use them in acquiring the land for the new facility. Nor did the city bargain over the seller's asking price or have the land appraised prior to the acquisition: "This was the price that he had asked for, what we ended up paying for it." *Id.*, at 93–94. The Government's expert witnesses testified that the city paid considerably more than fair market value for the new land. *Id.*, at 282, 321, 357.

condemned property was $225,000, and that the reasonable cost of a substitute facility was $723,624.01. Record, Doc. Nos. 199, 200. The District Court entered judgment for the lower amount plus interest on the difference between that amount and the sum already paid.[7] 529 F. Supp. 220 (ND Tex. 1981). The District Court explained that the city had not met its "burden of establishing what would be a reasonable cost of a substitute facility."[8] In addition, the court was of the view that "substitute facilities compensation should not be awarded in every case where a public condemnee can establish a duty to replace the condemned property, at least where a fair market value can be established." *Id.*, at 222. The court found no basis for departing from the market value standard in this case, and reasoned that the application of the substitute-facilities measure of compensation would necessarily provide the city with a "windfall."[9]

The Court of Appeals reversed and remanded for further proceedings. 706 F. 2d 1356 (CA5 1983). It reasoned that the city's loss attributable to the condemnation was "the amount of money reasonably spent . . . to create a functionally equivalent facility." *Id.*, at 1360. If the city was required, either as a matter of law or as a matter of practical

---

[7] The District Court awarded interest at the statutory rate of six percent, 40 U. S. C. § 258a, because the city had not offered any evidence indicating that a higher rate of interest prevailed. 529 F. Supp. 220, 223–224 (ND Tex. 1981).

[8] *Id.*, at 221.

[9] Relying on JUSTICE WHITE's concurring opinion in *United States v. 564.54 Acres of Land*, 441 U. S. 506, 518 (1979) *(Lutheran Synod)*, the District Court wrote:

"When the doctrine of cost of substitute facilities is applied, a windfall *necessarily* accrues to the condemnee who is awarded an amount sufficient to replace ancient or depleted facilities with brand new facilities. [441 U. S., at 517] (JUSTICE WHITE concurring). *See also [United States v.] 564.54 Acres*, 576 F. 2d 983, 996–1000 (3d Cir. 1978) (Judge Stern concurring). By definition, a market value represents approximately what it would cost to purchase the same or similar property in the marketplace." 529 F. Supp., at 222 (emphasis in original).

necessity, to replace the old landfill facility, the Court of Appeals believed that it would receive no windfall. The court, however, held that the amount of compensation should be adjusted to account for any qualitative differences in the substitute site. Finding that the trial judge's instructions had not adequately informed the jury of its duty to discount the costs of the substitute facility in order to account for its increased capacity and superior quality, see n. 4, *supra*, the Court of Appeals remanded for a new trial.[10] We granted the Government's petition for certiorari,[11] 465 U. S. 1098 (1984), and we now reverse with instructions to direct the District Court to enter judgment based on the jury's finding of fair market value.

## II

The Court has repeatedly held that just compensation normally is to be measured by "the market value of the property at the time of the taking contemporaneously paid in money." *Olson* v. *United States*, 292 U. S. 246, 255 (1934). "Considerations that may not reasonably be held to affect market value are excluded." *Id.*, at 256. Deviation from this measure of just compensation has been required only "when market value has been too difficult to find, or when its application would result in manifest injustice to owner or public." *United States* v. *Commodities Trading Corp.*, 339 U. S. 121, 123 (1950); *Kirby Forest Industries, Inc.* v. *United States*, 467 U. S. 1, 10, n. 14 (1984).

---

[10] "In light of [the remand for a new trial]," the Court of Appeals instructed the District Court to allow the city a second opportunity to present evidence on whether the rate of interest on the condemnation award should exceed the statutory rate of six percent. 706 F. 2d, at 1364. In view of our disposition of the case, the Court of Appeals' rationale for a new hearing on that issue is no longer valid.

[11] We denied the petition for certiorari filed by the city challenging the order of a new trial and seeking the entry of judgment on the jury's finding of the cost of the substitute facility. *City of Duncanville* v. *United States*, 465 U. S. 1022 (1984).

This case is not one in which an exception to the normal measure of just compensation is required because fair market value is not ascertainable. Such cases, for the most part, involve properties that are seldom, if ever, sold in the open market.[12] Under those circumstances, "we cannot predict whether the prices previously paid, assuming there have been prior sales, would be repeated in a sale of the condemned property." *Lutheran Synod*, 441 U. S., at 513. In this case, however, the testimony at trial established a fairly robust market for sanitary landfill properties, see n. 5, *supra*, and the jury's determination of the fair market value of the condemned landfill facility is adequately supported by expert testimony concerning the sale prices of comparable property. Cf. 441 U. S., at 513–514.

The city contends that in this case an award of compensation measured by market value is fundamentally inconsistent with the basic principles of indemnity embodied in the Just Compensation Clause. If the city were a private party rather than a public entity, however, the possibility that the cost of a substitute facility exceeds the market value of the condemned parcel would not justify a departure from the market value measure. *Lutheran Synod*, 441 U. S., at 514–517. The question—which we expressly reserved in the *Lutheran Synod* case[13]—is whether a substitute-facilities measure of compensation is mandated by the Constitution[14]

---

[12] "This might be the case, for example, with respect to public facilities such as roads or sewers." *Lutheran Synod*, 441 U. S., at 513.

[13] "This Court has not passed on the propriety of substitute-facilities compensation for public condemnees. . . . In light of our disposition of this case, we express no opinion on the appropriate measure of compensation for publicly owned property." *Id.*, at 509, n. 3.

[14] Congress, of course, has the power to authorize compensation greater than the constitutional minimum. See *United States* v. *General Motors Corp.*, 323 U. S. 373, 382 (1945); see, *e. g.*, Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 84 Stat. 1894, 42 U. S. C. § 4601 *et seq.* (requiring the payment of relocation assistance to specified persons and businesses displaced as a result of federal and federally assisted programs).

when the condemnee is a local governmental entity that has a duty to replace the condemned facility.

## III

The text of the Fifth Amendment certainly does not mandate a more favorable rule of compensation for public condemnees than for private parties.  To the contrary, the language of the Amendment only refers to compensation for "private property," and one might argue that the Framers intended to provide greater protection for the interests of private parties than for public condemnees.  That argument would be supported by the observation that many public condemnees have the power of eminent domain, and thus, unlike private parties, need not rely on the availability of property on the market in acquiring substitute facilities.

When the United States condemns a local public facility, the loss to the public entity, to the persons served by it, and to the local taxpayers may be no less acute than the loss in a taking of private property.  Therefore, it is most reasonable to construe the reference to "private property" in the Takings Clause of the Fifth Amendment as encompassing the property of state and local governments when it is condemned by the United States.[15]  Under this construction, the same principles of just compensation presumptively apply to both private and public condemnees.

## IV

The Court of Appeals correctly identified a dictum in *Brown* v. *United States*, 263 U. S. 78 (1923), as the source

---

[15] See *United States* v. *Carmack*, 329 U. S. 230, 242 (1946):

"[W]hen the Federal Government . . . takes for a federal public use the independently held and controlled property of a state or of a local subdivision, the Federal Government recognizes its obligation to pay just compensation for it and it is conceded in this case that the Federal Government must pay just compensation for the land condemned."

See also *Block* v. *North Dakota ex rel. Board of University and School Lands*, 461 U. S. 273, 291 (1983).

of what has become known as the "substitute-facilities doctrine."[16]    When that passage is read in the context of the Court's decision in that case, it lends no support to the suggestion that a distinction should be drawn between public and private condemnees.    Nor does it shed any light on the proper measure of compensation in this case.

The facts of the *Brown* case were, in the Court's word, "peculiar."[17]    The construction of a reservoir on the Snake River flooded approximately three-quarters of the town of American Falls, Idaho, an area of some 640 acres.    To compensate both the public and private owners of the flooded acreage, the Government undertook to relocate most of the town to the other side of the river.    The owners of a large tract to be included within the limits of the reconstructed town challenged the Government's power to condemn their property, contending that the transfer of their property to other private persons was not a "public use" as required by the Fifth Amendment.    Cf. *Hawaii Housing Authority* v. *Midkiff*, 467 U. S. 229, 239–244 (1984).

In rejecting that contention, the Court held that the Government's method of compensating the owners of the flooded property was legitimate.    Writing for the Court, Chief Justice Taft observed:

> "The usual and ordinary method of condemnation of the lots in the old town, and of the streets and alleys as town property, would be ill adapted to the exigency. . . . A town is a business center.    It is a unit.    If three-

---

[16] See, *e. g.*, *United States* v. *Certain Property in Borough of Manhattan*, 403 F. 2d 800, 803 (CA2 1968); *United States* v. *Board of Education of Mineral County*, 253 F. 2d 760, 763 (CA4 1958).

[17] "An important town stood in the way of a necessary improvement by the United States.    Three-quarters of its streets, alleys and parks and of its buildings, public and private, would have to be abandoned. . . . American Falls is a large settlement for that sparsely settled country and it was many miles from a town of any size in any direction.    It was a natural and proper part of the construction of the dam and reservoir to make provision for a substitute town as near as possible to the old one." 263 U. S., at 81.

quarters of it is to be destroyed by appropriating it to an exclusive use like a reservoir, all property owners, both those ousted and those in the remaining quarter, as well as the State, whose subordinate agency of government is the municipality, are injured. A method of compensation by substitution would seem to be the best means of making the parties whole. *The power of condemnation is necessary to such a substitution.*" 263 U. S., at 82–83 (emphasis added).

Taken in context, the apparent endorsement of compensation by substitution is made in support of the Government's power to condemn the property in *Brown* and does not state the proper measure of compensation in another case. *Lutheran Synod,* 441 U. S., at 509, n. 3.

*Brown* merely indicates that it would have been constitutionally permissible for the Federal Government to provide the city with a substitute landfill site instead of compensating it in cash. Nothing in *Brown* implies that the Federal Government has a duty to provide the city with anything more than the fair market value of the condemned property.

## V

In this case, as in most, the market measure of compensation achieves a fair "balance between the public's need and the claimant's loss." *United States* v. *Toronto, Hamilton & Buffalo Navigation Co.,* 338 U. S. 396, 402 (1949). This view is consistent with our holding in *Lutheran Synod* that fair market value constitutes "just compensation" for those private citizens who must replace their condemned property with more expensive substitutes and with our prior holdings that the Fifth Amendment does not require any award for consequential damages arising from a condemnation.[18]

---

[18] See *United States* v. *General Motors Corp.,* 323 U. S., at 382; see generally J. Gelin & D. Miller, Federal Law of Eminent Domain § 2.4(B) (1982).

The city argues that its responsibility for municipal garbage disposal justifies a departure from the market value measure in this case. This responsibility compelled the city to arrange for a suitable replacement facility or substitute garbage disposal services.[19] This obligation to replace a condemned facility, however, is no more compelling than the obligations assumed by private citizens. Even though most private condemnees are not legally obligated to replace property taken by the Government, economic circumstances often force them to do so. When a home is condemned, for example, its owner must find another place to live. The city's legal obligation to maintain public services that are interrupted by a federal condemnation does not justify a distinction between public and private condemnees for the purpose of measuring "just compensation."[20]

Of course, the decision in *Lutheran Synod* was based, in part, on a fear that a private condemnee might receive a "windfall" if its compensation were measured by the cost of a substitute facility and "substitute facilities were never acquired, or if acquired, were later sold or converted to another use." 441 U. S., at 516. The Court of Appeals suggested that the city's obligation to replace the facility avoids this risk, 706 F. 2d, at 1360, but we do not agree. If the replacement facility is more costly than the condemned facility, it presumably is more valuable,[21] and any increase in the quality

---

[19] The Court of Appeals left open the question whether the city was, in fact, under an obligation to replace its landfill facility, 706 F. 2d, at 1360, n. 6, but for purposes of our decision we assume that it was obligated to do so.

[20] In holding that the substitute-facilities measure of compensation was appropriate in this case, the Court of Appeals did not rely solely on the city's legal obligations to arrange for garbage disposal within the municipality, but also on "any practical, economic or logistical advantages of the city's operation and control of its own sanitary landfill." *Ibid.*

[21] "Obviously, replacing the old with a new facility will cost more than the value of the old, but the new facility itself will be more valuable and last longer." *Lutheran Synod*, 441 U. S., at 518 (WHITE, J., concurring).

of the facility may be as readily characterized as a "windfall" as the award of cash proceeds for a substitute facility that is never built.

The Court of Appeals, however, believed that the risk of any windfall could be reduced by discounting the cost of the substitute facility to account for its superior quality. *Id.*, at 1362–1363. This approach would add uncertainty and complexity to the valuation proceeding without any necessary improvement in the process. In order to implement the Court of Appeals' approach, the factfinder would have to make at least two determinations: (i) the reasonable (rather than the actual) replacement cost, which would require an inquiry into the fair market value of the second facility; and (ii) the extent to which the new facility is superior to the old, which would require an analysis of the qualitative differences between the new and the old. It would also be necessary to determine the fair market value of the old property in order to provide a basis for comparison. There is a practical risk that the entire added value will not be calculated correctly; moreover, if it is correctly estimated, the entire process may amount to nothing more than a roundabout method of arriving at the market value of the condemned facility.[22]

Finally, the substitute-facilities doctrine, as applied in this case, diverges from the principle that just compensation must be measured by an objective standard that disregards subjective values which are only of significance to an individual owner. As the Court wrote in *Kimball Laundry Co.* v. *United States*, 338 U. S. 1, 5 (1949):

> "The value of property springs from subjective needs and attitudes; its value to the owner may therefore differ widely from its value to the taker. Most things, how-

---

[22] Indeed, one might infer from the record that this would be the result here. See nn. 4 and 6, *supra.* The District Court, in fact, found that an award of fair market value would place the city "in as good a position pecuniarily as if its property had not been taken." 529 F. Supp., at 223.

ever, have a general demand which gives them a value transferable from one owner to another. As opposed to such personal and variant standards as value to the particular owner whose property has been taken, this transferable value has an external validity which makes it a fair measure of public obligation to compensate the loss incurred by an owner as a result of the taking of his property for public use. In view, however, of the liability of all property to condemnation for the common good, loss to the owner of nontransferable values deriving from his unique need for property or idiosyncratic attachment to it, like loss due to an exercise of the police power, is properly treated as part of the burden of common citizenship."

The subjective elements in the formula for determining the cost of reasonable substitute facilities would enhance the risk of error and prejudice.[23] Since the condemnation contest is between the local community and a National Government that may be thought to have unlimited resources, the open-ended character of the substitute-facilities standard increases the likelihood that the city would actually derive the windfall that concerned both the District Court and the Court of Appeals.[24] "Particularly is this true where these issues are to be left for jury determination, for juries should not be given sophistical and abstruse formulas as the basis for their findings nor be left to apply even sensible formulas to factors that are too elusive." *Id.*, at 20.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

---

[23] Cf. R. Posner, Economic Analysis of Law 402 (2d ed. 1977) ("The vogue of cost-benefit analysis has created inflated notions of the effectiveness of analytical techniques in resolving questions of cost and demand").

[24] Of course, we express no view on the admissibility of testimony on reproduction cost when it is offered on the issue of fair market value. Cf. *United States* v. *Commodities Trading Corp.*, 339 U. S. 121, 126 (1950). The admissibility of such evidence must be evaluated under the generally applicable rules of evidence. *E. g.*, Fed. Rules Evid. 401–403, 701–705.

JUSTICE O'CONNOR, with whom JUSTICE POWELL joins, concurring.

I concur in the Court's opinion and judgment that, on the facts of this case, the city of Duncanville is justly compensated by the payment of the market value for the sanitary landfill that was condemned by the Government. I write separately to note that I do not read the Court's opinion to preclude a municipality or other local governmental entity from establishing that payment of market value in a particular case is manifestly unjust and therefore inconsistent with the Just Compensation Clause. See *ante*, at 29. When a local governmental entity can prove that the market value of its property deviates significantly from the make-whole remedy intended by the Just Compensation Clause and that a substitute facility must be acquired to continue to provide an essential service, limiting compensation to the fair market value in my view would be manifestly unjust. Because the city of Duncanville did not establish that the market value in this case deviated significantly from the indemnity principle, I agree that the decision of the Court of Appeals should be reversed.