William E. GRIFFIN and John
H. Taylor[1], Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civil Action No. 80–3227 JGP.

United States District Court,
District of Columbia.

Nov. 20, 1995.

---

1. This action was brought by former President Richard M. Nixon. Mr. Nixon died in 1994 and the present plaintiffs, William E. Griffin and John H. Taylor, the executors of his estate, were substituted in his place. *See* Fed.R.Civ.P. 25(a).

Herbert John Miller, Jr., Richard Stan Mortenson, Miller, Cassidy, Larroca & Lewin, L.L.P., Washington, DC, for Richard Nixon.

Richard Stan Mortenson, Martin David Minsker, Miller, Cassidy, Larroca & Lewin, L.L.P., Washington, DC, for William E. Griffin, John H. Taylor.

David Jay Anderson, Jessica A. Lerner, U.S. Department of Justice, Civil Division, Washington, DC, Neil H. Koslowe, U.S. Department of Justice, Washington, DC, for United States of America.

## MEMORANDUM

JOHN GARRETT PENN, Chief Judge.

This matter comes before the Court on defendant's **Motion for Summary Judgment on the Issue of Compensation or, in the Alternative, for Partial Summary Judgment** and plaintiffs' **Motion for Partial Summary Judgment Granting Declaratory Relief.** After careful consideration, the Court concludes: (1) That defendant's motion for summary judgment on the issue of compensation should be denied, (2) that plaintiffs' motion for partial summary judgment should be granted and (3) that defendant's motion for partial summary judgment should be granted.

## I.

### Background

The Presidential Recordings and Materials Preservation Act of 1974 ("PRMPA"), note following 44 U.S.C.A. § 2111, which became effective on December 19, 1974, directed the Administrator of General Services (as of April 1, 1985, the Archivist of the United States) to retain custody and control of the Presidential historical materials of Richard M. Nixon. Former President Richard M. Nixon filed this action under the PRMPA, § 105(a) alleging that these materials belonged to him personally, and he seeks compensation under the Fifth Amendment for their alleged "taking" by the United States.

In 1991, this Court granted the defendant's (hereinafter also referred to as "the government") motion for summary judgment, concluding that the materials that were the subject of the PRMPA were not Mr. Nixon's private property, and that even if they were, they were not "taken" from him within the meaning of the Takings Clause of the Fifth Amendment. Mr. Nixon appealed. The Court of Appeals reversed, reasoning that on the basis of history, custom, and usage, Mr. Nixon *owned* the materials at the time the PRMPA became effective, and that the PRMPA constituted a *per se* taking of his personal property. *Nixon v. United States,* 298 U.S.App.D.C. 249, 978 F.2d 1269 (1992). Of additional significance, the Court of Appeals concluded that Mr. Nixon had a "compensable property interest in his presidential papers,"[2] 298 U.S.App.D.C. at 250, 978 F.2d at 1270, noting that "[h]istory, custom, and usage indicated unequivocally that, prior to the PRMPA, Presidents exercised complete

---

**2.** In 1978, Congress prospectively abolished presidential ownership of White House materials with the Presidential Records Act, 44 U.S.C. § 2201 *et seq.*

dominion and control over their papers."[3] 298 U.S.App.D.C. at 257, 978 F.2d at 1277. Notwithstanding that decision, the Court of Appeals recognized that "difficult questions regarding the measure of damages remain." 298 U.S.App.D.C. at 267, 978 F.2d at 1287[4]. Accordingly, the Court of Appeals remanded, leaving all questions of compensation "to [be addressed] in the first instance" by this Court. *Id.*

On remand, the government asserts that it is entitled to summary judgment because plaintiffs are not entitled to any compensation for the taking of Mr. Nixon's presidential materials. This position is grounded in two theories.

*First,* the government asserts that the Emoluments Clause, Article II, Section 1, Clause 6 of the Constitution, prohibits a President from receiving any "emolument" from the United States beyond the compensation fixed by Congress before he or she took office. The Framers of the Constitution forbade the President from receiving any emolument other than a fixed compensation, in part because they feared the consequences of allowing a President to convert his or her office into a vehicle for personal profit. Thus, according to the government, the salary and benefits provided to Mr. Nixon by the United States during his presidency were the only economic benefits the United States could have provided him in consequence of his holding the Office of benefits the United States could have provided him in consequence of his holding the Office of President. The government reasons that because these materials are the physical representation of Mr. Nixon's exercise of powers and duties of the Office of President given to him by the United States, plaintiffs are not entitled to any compensation by virtue of the Emoluments Clause.

*Second,* the government contends that even if the Emoluments Clause does not bar an award of compensation by the United States to Mr. Nixon for his presidential materials, such an award would result in manifest unfairness to the public and, therefore, would not be "just" within the meaning of the Just Compensation Clause. The Supreme Court has recognized that the Just Compensation Clause does not require the United States to compensate a plaintiff for elements of value that derive directly from special public privileges granted by the government. Here, the government contends that a payment to plaintiffs would be unjust because the value of Mr. Nixon's presidential materials derives solely from his status as President.

In the alternative, the government contends that even if the Court concludes that plaintiffs may be compensated for some of the materials, partial summary judgment should be granted with respect to materials which are excluded from the definition of "Presidential historical materials" in the Act's implementing regulations, or which had no fair market value at the time the Act became effective.

In contrast, plaintiffs contend that the presidential materials produced through Mr. Nixon's exercise of the powers and duties given to him by the United States had an economic value. Thus, they argue, it is this value for which they now should be compensated.

## II.

### A. *Emoluments Clause*

The government asserts that the Emoluments Clause to the Constitution, Article II, Section 1, Clause 6, precludes the payment of compensation to Mr. Nixon for his presidential materials. The Emoluments Clause provides:

---

**3.** In fact, every president, both before and after Mr. Nixon, assumed control of his presidential papers upon leaving office. 298 U.S.App.D.C. at 257, 978 F.2d at 1277. Several presidents have donated their papers to the United States in exchange for a publicly supported Presidential Library. Former Presidents "have been able to use real leverage in negotiating with respect to the disposition of presidential papers to extract from the United States 'fancy sums' in the form of lucrative deals, while maintaining essential control over the materials." 298 U.S.App.D.C. at 259, 978 F.2d at 1279.

**4.** The liability and compensation phases of this case have been bifurcated.

The President shall, at stated Times, receive for his Services, a Compensation, which shall neither be increased nor diminished during the Period for which he shall have been elected, and he shall not receive within that period any other Emolument from the United States, or any of them.

The clause can be broken down into two parts. The first part provides that the amount of compensation, shall neither be increased nor diminished. This section was intended by the Framers to protect the independence of the President from manipulation by Congress. Because the President's salary can neither be increased nor diminished during his term, his financial interests are insulated from congressional augmentation or depreciation. As the government notes, "[w]ith no ability to persuade Congress to augment his [or her] compensation while in office, the President would 'have no pecuniary inducement to renounce or desert the independence intended for him by the Constitution.'" *See* Defendant's Memorandum of Points and Authorities in Support of Motion for Summary Judgment on the Issue of Compensation ("Defendant's Memorandum") at 9 (citing The Federalist No. 73, at 216 (Alexander Hamilton) (Roy P. Fairfield, 2d ed. 1981)).

The second section of the clause is relevant to the instant case. That section states that "the President shall not receive within that period any other emolument from the United States, or any individual state." This provision addressed the Framers' concern that the President should not have the ability to convert his or her office for profit.

Defendant contends that the Emoluments Clause prohibits compensation for objects acquired or produced during the course of Mr. Nixon's presidency. Although the government acknowledges the Court of Appeals' conclusion that Mr. Nixon owned his papers at the time of the taking, it asserts that a sitting President is precluded from taking materials and selling them for personal profit during, or *after*, his or her presidency. The government bases this position on the fact

that the presidential materials are the product of Mr. Nixon's exercise of the powers and duties given to him by the United States, and therefore the only compensation he was allowed to receive from the United States during his term of office was his salary and related benefits. *See* Defendant's Memorandum at 10–11.

In opposition, plaintiffs assert that the mandate rule forecloses the government's argument that plaintiffs are not entitled to any compensation. In the alternative, plaintiffs argue that even if the mandate rule does not apply, they are still entitled to compensation.

With respect to the Emoluments Clause, plaintiffs assert that for two independent reasons, the plain language of the Emoluments Clause does not foreclose just compensation for the taking of Mr. Nixon's compensable property rights. *First,* plaintiffs note that "Mr. Nixon's constitutional entitlement to just compensation for the taking of his property vested when the government took the property *after he left office.*" *See* Plaintiffs' Opposition to Defendant's Motion for Summary Judgment ("Plaintiffs' Opposition") at 12. *Second,* plaintiffs highlight the fact that Mr. Nixon acquired ownership rights in his presidential materials from the time they were created. They argue that since the presidential papers were never public property to begin with, the Emoluments Clause does not apply to them. Although Mr. Nixon acquired a compensable property interest in the materials at the time they were created, he did not seek compensation for the materials until after he left office.[5]

Before addressing the merits of the these arguments, it is important to carefully note the language of the Court of Appeals' decision. The Court of Appeals stated:

Upon reviewing the long and unbroken history relating to the use, control, and disposition of presidential papers, we are convinced that Mr. Nixon had a well grounded expectation of ownership. In the light of this history, we hold that Mr. Nixon, like every President before him,

---

5. At the motions hearing, plaintiffs emphasized: "[T]he Court of Appeals did not specifically differentiate between 'sales in office or otherwise.'" *See* Tr. at 19. Nevertheless, plaintiffs position is

that the Emoluments Clause does not preclude President from selling his or her presidential materials while in office. *See* Tr. at 20.

had a compensable property interest in his presidential papers. 298 U.S.App.D.C. at 250, 978 F.2d at 1270. The Court of Appeals recognized that "[h]istory, custom, and usage indicate unequivocally that, prior to PRMPA, Presidents exercised complete dominion and control over their presidential papers." 298 U.S.App.D.C. at 257, 978 F.2d at 1277. Thus, the court made clear that Mr. Nixon owned his papers at the time of the taking. Accordingly, the precise question before the Court is whether Mr. Nixon's estate is entitled to any compensation for these papers. Against this backdrop, the Court begins its analysis, focusing first on the mandate rule.

### A.1. Mandate Rule.

 The mandate rule or "law of the case doctrine" provides that "a legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time." *Williamsburg Wax Museum v. Historic Figures, Inc.*, 258 U.S.App.D.C. 124, 131, 810 F.2d 243, 250 (1987) (citations omitted). Similarly, "[w]hen a case is appealed and remanded, the decision of the appellate court establishe[s] the law of the case, which must be followed by the trial court on remand." J.W. Moore, 1B *Moore's Federal Practice*, ¶ 0.404[1] at p. II–3 (2nd ed. 1994).

 Issues that have been decided, either explicitly or by necessary inference from the disposition, constitute the law of the case. *See North Mississippi Communications, Inc. v. Jones*, 951 F.2d 652, 655 (5th Cir. 1992). Thus, for the mandate rule to apply

with respect to the instant case, the Court of Appeals must have expressly or impliedly rejected the government's arguments on the matter of compensation.[6]

Here, plaintiffs contend that the record and the Court of Appeals' opinion demonstrates that the instant case was remanded *only* for a determination of the value of Mr. Nixon's property, not whether he is entitled to compensation at all. They argue that the Court of Appeals either explicitly or implicitly held that Mr. Nixon is entitled to compensation for his presidential papers. Specifically, they note that the Court of Appeals stated that "[i]n light of this history, we hold that Mr. Nixon, like every President before him, had a compensable property interest in his presidential papers." 298 U.S.App.D.C. at 250, 978 F.2d at 1270. Plaintiffs also contend that the government, in arguing before the Court of Appeals that there was no taking of compensable property, defendant previously raised its Emoluments Clause defense.[7]

In contrast, the government maintains that the mandate rule does not control the outcome of the motions, because the Court of Appeals expressly directed this Court to consider and resolve all compensation questions in the first instance.

Essentially, plaintiffs frame the issue as follows: The Court of Appeals determined that Mr. Nixon had a compensable property interest in his presidential materials, therefore, the only task the Court need oversee is an appropriate valuation of those materials. On the other hand, the government contends that nowhere in the Court of Appeals' decision does it indicate that the government is precluded from arguing that the appropriate

---

6. The Court refers to the following excerpt from the motions hearing where the government stated: "Plaintiffs believe that the Court of Appeals, by implication, when it disposed of the issue of ownership, also disposed of our contention that under the Emoluments Clause and under general principles of equity the measure of compensation ought to be zero." *See* Tr. at 4.

7. Plaintiffs contend that the Court of Appeals considered the Emoluments Clause argument. Plaintiffs point out that on the issue of the Emoluments Clause, the government asserted in its appellate brief that:

Mr. Nixon did not acquire absolute ownership of the presidential historical materials subject to the Act and its regulations under any of the methods prescribed by common law. Obviously, he did not inherit or purchase them, and no one made a gift of the materials to him. Indeed, the Emoluments clause of the Constitution ... would have prevented a sitting salaried President from receiving from the government such valuable materials in the form of private property.

Brief for Defendant–Appellee Exhibit 2, at 23.

measure of compensation for the presidential materials is zero.

After careful consideration, the Court concludes that the mandate rule does not foreclose consideration of the government's arguments. Nevertheless, the Court concludes that the government's arguments concerning the Emoluments Clause and the Just Compensation Clause cannot be sustained because the Court of Appeals determined that Mr. Nixon was the owner of his presidential materials. Based on history, custom and usage, this Court concludes in the first instance, that plaintiffs are entitled to some measure of compensation for Mr. Nixon's presidential materials. The valuation of Mr. Nixon's presidential materials is a task this Court must complete in the first instance.

### A.2 The Emoluments Clause Does Not Bar Compensation

■ The Court finds that the Emoluments Clause does not bar the award of compensation to Mr. Nixon's heirs. Mr. Nixon's entitlement to just compensation for the taking vested when the government took the property. This taking occurred after Mr. Nixon left office. Thus, the plain language of the Emoluments Clause would not be violated because Mr. Nixon would receive compensation subsequent to the expiration of his term of office. Although the government contends that such a finding necessarily implies that a sitting President could sell his or her papers while in office, it is clear that those are not the facts in this case.[8] Mr. Nixon owned his presidential papers, and a logical corollary is his right to sell those papers. The presidential papers constitute private property Mr. Nixon owned; they were not transferred to him by the government as compensation for his service in office. It is clear that history, custom and usage support the theory that proceeds derived from the sale of Mr. Nixon's presidential papers do not constitute an emolument. As the Court of Appeals noted, Presidents "have been able to use real leverage in negotiating with respect to the disposition of presidential papers to extract from the United States 'fancy sums' in the form of lucrative library deals, while maintaining essential control over the materials." 298 U.S.App.D.C. at 259, 978 F.2d at 1279. Indeed, Presidents have used their "leverage" to extract "lucrative library deals" while they were still in office. Similarly, Congress has authorized the purchase of presidential materials, and has authorized purchase by the Library of Congress.

### B. Government/Publicly Created Value Argument

■ Next, the government argues that even if the Emoluments Clause does not prohibit Mr. Nixon from receiving compensation for his presidential materials, plaintiffs are still precluded from receiving compensation under the Fifth Amendment's Just Compensation Clause. The government contends that the Just Compensation Clause does not require the public to pay for value realized from the conferral of public privileges. The government notes that Mr. Nixon's papers would not be valuable but for the fact these are presidential materials, and the Office of the Presidency is a public one. *See, e.g., United States ex rel and for Use of TVA v. Powelson,* 319 U.S. 266, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943).

In *Powelson,* the United States, on behalf of the Tennessee Valley Authority, condemned a tract of land which the owner contended should have been valued based on the his imminent plans to combine it with surrounding property for use as part of an elaborate hydroelectric project. The owner, a corporation, was able to combine the lands for such a project because the State of North Carolina, through a special legislative enactment, had granted the corporation the power of eminent domain.

In addressing whether the owner's compensation should be adjusted in light of this framework, the Supreme Court concluded that it would violate the principles of "equity and fair dealing" inherent in the concept of just compensation if the United States were made to pay the owner for value resulting

---

8. The government stated at the motions hearing that "[p]laintiffs' whole case depends on the proposition that while he was in office Mr. Nixon could have had a public auction and sold off every single one of the 43 million documents, every single one of the 880 tapes." *See* Tr. at 58.

from the owner's special public privilege to use the public power of eminent domain. *Powelson*, 319 U.S. at 280, 63 S.Ct. at 1055. The Supreme Court explained that the state-granted power of eminent domain

> is not a personal privilege; it is a special authority impressed with a public character and to be utilized for a public end. An award based on the value of that privilege would be an appropriation of public authority to a wholly private end. The denial of such an award to the landowner does no injustice.

*Id.*

By analogy, with respect to the instant case, the government argues that if it would be unfair to require the United States to compensate the property owner in *Powelson* for value resulting from the owner's state-granted power of eminent domain, it would be unjust to require the public to compensate plaintiffs for the materials which document the exercise of presidential powers by Mr. Nixon. The government contends that whatever value those materials may have is the direct product of the executive powers vested in Mr. Nixon to serve the public to compensate plaintiffs for the materials which document the exercise of presidential powers by Mr. Nixon.

In contrast, plaintiffs contend that the *Powelson* case is inapposite. Plaintiffs assert that *Powelson* stands for the proposition that a plaintiff is not entitled to just compensation for those rights he or she could have in theory exercised with respect to their property. As the Supreme Court stated: "Respondent's project was only a speculative venture, a promotional scheme wholly in futuro. Thus, we conclude that Respondent had no interest in his unexercised power of eminent domain which rises to the estate of 'private property' within the meaning of the Fifth Amendment." *Powelson*, 319 U.S. at 281, 63 S.Ct. at 1055.

The government further contends that the public cannot fairly be required to pay again for materials that were created by the government entirely at public expense. In this instance, the government's theory is that the public has already paid all of the costs of producing the papers. Such a result would result in plaintiffs' receipt of "double" compensation. *See United States v. Delaware, Lackawanna & W. RR. Co.*, 264 F.2d 112 (3rd Cir.), *cert. denied*, 361 U.S. 819, 80 S.Ct. 63, 4 L.Ed.2d 65 (1959). The government contends that the United States would be required to pay for materials twice if it were compelled to compensate plaintiffs for the presidential papers, which were produced by public employees, on office equipment and in facilities financed entirely by United States taxpayers. Not only would the public be paying "double" compensation if it were required to pay plaintiffs for the presidential papers, but such payment would constitute a major "windfall to the property-owner." Defendant's Memorandum at 25 (citing *Lackawanna*, 264 F.2d at 117).

In contrast, plaintiffs assert that the "government-created value" is a part of the citizen's compensable property rights under the Fifth Amendment. Under this approach, any government created value is compensable so long as the mutual expectations establish that the citizen owns that value at the time of the taking, and the value is not unreasonably inflated based on the special need of the government for the property.

In addition, plaintiffs contend that the Court of Appeals' opinion in this action stands for the proposition that "when presidents left office, they left their office not only with salary, but they left their office in addition to salary with 100 percent privately-owned private property in the form of presidential materials." *See* Tr. at 45. Thus, plaintiffs urge that the resolution of this issue is controlled by the mutual expectancy of the parties. Thus, in the instant case based on history, custom and usage, the government would have to purchase those materials.

There is no question that there is merit in the government's argument. However, based upon the decision of the Court of Appeals, the Court concludes that plaintiffs have an expectancy of compensation with respect to Mr. Nixon's presidential materials. Here, as the Court of Appeals has determined, Mr. Nixon was the property owner at the time of the taking and had dominion and

control over this property. Accordingly, plaintiffs are entitled to indemnity in the form of the value of Mr. Nixon's materials at the time of the taking.

Realizing that the task of valuing these materials still lies ahead, the Court notes that plaintiffs filed a motion for a declaration that the applicable standard here is fair market value, if ascertainable. At the motions hearing, the government indicated that '[i]f the Court rejects our two theories.... We would say if the fair market value is ascertainable, then that should be the measure of compensation.' *See* Tr. at 56. Accordingly, in view of the government's concession, the Court concludes that plaintiffs' motion for partial summary judgment granting declaratory relief should be granted.

### III.

### *Compensation For Materials Excluded From PRMPA Regulations*

In the alternative, the government contends that if the Court does not sustain its two defenses, i.e. the Emoluments Clause and the equity argument, the Court should enter partial summary judgment in favor of defendant, holding that the regulatory definition controls for compensation purposes.[9] The regulations exclude a number of categories of materials which may have been located in the White House at the time the Act took effect but which do not constitute "Presidential historical materials" within the context of the Act.

9. Under the PRMPA, the United States took custody and possession of "all original tape recordings" of conversations involving former President Nixon or made at the White House and other presidential locations. Further, "all papers, documents, memorandums, transcripts, and other objects which constitute the Presidential historical materials of Richard M. Nixon" were taken.

The term *"historical materials"* in the Act is defined, by reference to 44 U.S.C. § 2101(2), to include "books, correspondence, documents, papers, pamphlets, works of art, models, pictures, photographs, plats, maps, films, motion pictures, sound recordings, and other objects or materials having historical or commemorative value."

The *implementing regulations* issued by the Archivist, under sections 103 and 104(a) of the Act, more precisely define the term "Presidential

The excluded materials are "documentary materials of any type that are determined to be the official records of an agency of the Government; private or personal materials; stocks of publications, processed documents, and stationery; and extra copies of documents produced only for convenience or reference when they are clearly so identified." 36 C.F.R. § 1275.16(a). The excluded private or personal materials are

those papers and other documentary or commemorative materials in any physical form relating solely to a person's family or other non-governmental activities, including private political associations, and having no connection with his constitutional or statutory powers or duties as President or as a member of the President's staff.

*See* 36 C.F.R. § 1275.16(b).

The government contends that plaintiffs are not entitled to compensation with respect to two main areas of materials. Specifically, these areas are (1) stocks of publications and (2) national security materials.

### A. *Stocks of Publications/Social Files, Domestic Gifts*

The government contends that the "Government Printing Office Publications" and the "White House Library" materials appear to be excludable under 36 C.F.R. § 1275.16(a), because these items consist of "stock of publications" provided to the Nixon White House for reference purposes only. Further, the government contends that to

historical materials". The term "Presidential historical materials" is defined as follows:

all papers, correspondence, documents, pamphlets, books, photographs, films, motion pictures, sound and video recordings, machine-readable media, plats, maps, models, pictures, works of art, and other objects or materials made or received by former President Richard M. Nixon or by members of his staff in connection with his constitutional or statutory powers or duties as President and retained or appropriate for retention as evidence of or information about these powers or duties. Included in this definition are materials relating to the political activities of former President Nixon or members of his staff, but only when those activities directly relate to or have a direct effect upon the carrying out of constitutional or statutory powers or duties.

36 C.F.R. § 1275.16(a).

the extent that the "Social Files (First Lady)" and "Domestic Gifts" include private material, that material would be excludable from the definition of "Presidential historical materials" under 36 C.F.R. § 1275.16(b) because they are "private or personal". The government further contends that extra copies of documents would be excludable from "Presidential historical materials". *See* 36 C.F.R. § 1275.16(a) ("extra copies of documents produced only for convenience or reference").

Plaintiffs do not specifically respond to these areas in their opposition, instead choosing to address whether compensation is appropriate with respect to national security materials. Accordingly, in view of plaintiffs' lack of response, the Court deems it that they do not oppose the granting of this portion of the government's motion.

### B. Classified Materials

■ The government also contends that plaintiffs should not be compensated for the "national security council files" or other classified materials that Court of Appeals held were "taken" under the Act. The government reasons that those materials could not have been transferred nor sold to members of the public when the Act became effective, so there was no market for them. Thus, if there was no market for them, they could not have a fair market value as a matter of law.

The relevant documents controlling the handling of national security information and material on the date the Act became effective were Executive Order 10,865, 25 Fed.Reg. 1583 (1960), *reprinted in* 50 U.S.C. § 401, and Exec. Order No. 11,652, 37 Fed.Reg. 5209 (1972). These executive orders would have barred Mr. Nixon from selling classified materials or selling access to them.

Section 6(A) of Executive Order 11,652 specifies that no person may be given access to classified material unless that person "has been determined to be trustworthy," and unless access to the material "is necessary for the performance of his duties." Section 6(C) provides that classified material "shall be used, possessed, and stored only under conditions which will prevent access by unauthorized persons or dissemination to unautho-

rized persons." Section 12 provides that persons outside the Executive Branch who are engaged in historical research projects, or who have previously occupied policy-making positions to which they were appointed by the President, may be granted access to classified material only if the head of the government department in which the information or material originated determines that access is "clearly consistent with the interests of national security," and takes appropriate steps to assure that "classified information or material is not published or otherwise compromised." Section 2 of Executive Order 10,865 similarly provides that only the head of a department or his designee may authorize access to classified material.

Plaintiffs oppose the government's motion based on the following reasons. *First,* that nowhere do the executive orders and statutes the government cites expressly or impliedly prohibit such transactions; *second,* that the government's argument fails to recognize that classified materials do not retain this status indefinitely; and *third,* that even if the Court accepted the government's argument that the classified materials had no market and hence no market value, courts may depart from the fair market value standard. Plaintiffs contend that although fair market value is the general measure of just compensation, in cases "involv[ing] properties that are seldom, if ever, sold in the open market," "an exception to the normal measure of just compensation is required because fair market value is not ascertainable." *See United States v. 50 Acres of Land,* 469 U.S. 24, 30, 105 S.Ct. 451, 455, 83 L.Ed.2d 376 (1984).

The Court concludes that the government's motion for partial summary judgment should be granted with respect to national security materials. The measure of any compensation due attaches as of the date of the taking. Here, the taking occurred on the day the PRMPA became effective. At that time, the national security materials were classified and subject to executive orders which would not allow a President to transfer ownership of them to a member of the public without violating the law. In fact, plaintiffs, through their motion for partial summary judgment

granting declaratory relief, concede that compensation should be measured pursuant to the fair market value at the time of the taking.

In addition, the Court finds that plaintiffs' argument pertaining to an alternative measure of determining compensation may not be sustained. Here, the government has not vitiated the market for Mr. Nixon's national security materials before attempting to purchase them, thus rendering them without value. Instead, those materials were legitimately classified for national security reasons. Accordingly, plaintiffs are not entitled to compensation for these materials and defendant's motion for partial summary judgment is granted.

## IV.

### *Conclusion*

In line with the foregoing, the Court concludes the following: (1) that defendant's motion for summary judgment on the issue of compensation should be denied; (2) that plaintiffs' motion for partial summary judgment granting declaratory relief should be granted; and (3) that defendant's motion, in the alternative, for partial summary judgment should be granted.