HILL, J.:
This appeal requires us to determine whether a county may sue another political subdivision and the South Carolina Department of Transportation (SCDOT) for inverse condemnation. Because we hold the property Georgetown County (the County) alleges was inversely condemned is not "private property" within the meaning of the Takings Clause of S.C. Const. art I, § 13, and further hold the County may not sue SCDOT, a state agency, on such a claim, we affirm dismissal of the County's claim.
I.
The County alleges the City of Georgetown (the City) and SCDOT, while engaged in a joint water drainage project, altered the water table, causing sinkholes to form and damaging public buildings and real property owned by the County. The County brought numerous causes of action against the City, SCDOT, and their private contractors, including one for inverse condemnation against the City and SCDOT. The City and SCDOT moved to dismiss the County's inverse condemnation claim pursuant to Rule 12(b)(6) of the South Carolina Rules of Civil Procedure (SCRCP). The circuit court granted the motion to dismiss, which the County now appeals.
II.
In deciding a Rule 12(b)(6) motion, the trial court looks only at the complaint and, taking the facts alleged as true and construing all reasonable inferences and doubts in plaintiff's favor, asks whether the complaint would entitle the plaintiff to relief under any theory. Doe v. Marion , 373 S.C. 390, 395, 645 S.E.2d 245, 247-48 (2007). We use the same standard to review the dismissal order on appeal. Id .
A. Inverse Condemnation and the South Carolina Takings Clause
An inverse condemnation claim derives from the Takings Clause of our state constitution, which provides: "Except as otherwise provided in this Constitution, private property shall not be taken for private use without the consent of the owner, nor for public use without just compensation being first made for the property." S.C. Const. art. I, § 13 (A). The County urges us to interpret "private property" as used in the Takings Clause to mean any property not owned by the condemnor, here the State. The County suggests this interpretation furthers the intent motivating the Takings Clause, i.e. to justly compensate a property owner for the taking. According to the County, it is damaged by the State's condemning of their property no less than a private citizen would be and is no less entitled to the just compensation our constitution guarantees.
We disagree with the County's interpretation that the private property referred to in the Takings Clause means any property not owned by the condemnor. The Takings Clause does not define what it means by private property, so we must turn to the "ordinary and popular meaning" of the term. See Richardson v. Town of Mount Pleasant , 350 S.C. 291, 294, 566 S.E.2d 523, 525 (2002) ; Private , The American Heritage Dictionary of the English Language (1978) ("4. Belonging to a particular person or persons, as opposed to the public or the government: private property ."); Private , Webster's Ninth New Collegiate Dictionary (9th ed. 1988) ("[I]ntended for or restricted to the use of a particular person, group or class ... belonging to or concerning an individual person, company, or interest."). Public is an antonym of private. We therefore hold the term private property as used in the Takings Clause of the South Carolina Constitution applies only to property owned by a private citizen, private corporation, or non-public entity. It does not encompass property owned by the State, its agencies, political subdivisions (including counties and municipal corporations), *474 or other public entities. See Roschen v. Ward , 279 U.S. 337, 339, 49 S.Ct. 336, 73 L.Ed. 722 (1929) ("[T]here is no canon against using common sense in construing laws as saying what they obviously mean.") (Holmes, J.); Gibbons v. Ogden , 22 U.S. (9 Wheat. 1), 188, 6 L.Ed. 23 (1824) ("[T]he enlightened patriots who framed our constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said.").
Our holding was foreshadowed over a century ago in Edgefield County v. Georgia-Carolina Power Co. , 104 S.C. 311, 88 S.E. 801 (1916). At issue in that case was whether Edgefield County could sue a power company for flooding county roads. An Act of the General Assembly had authorized the power company to build a dam across the Savannah River, and the authority included a general power of condemnation. Id . at 322-27, 88 S.E. at 804-06. The circuit court denied the power company's demurrer to the county's complaint. Affirming the circuit court, the supreme court remarked the State could have flooded or even closed the county's road "and Edgefield could not complain about it." Id . at 328, 88 S.E. at 806-07. Likewise, the State, by the Act, could have "expressly" granted the power company the right to flood the roads. Id . The court observed: "[I]f the company should thereby flood the private property of the citizen, then under constitutional protection it would need to make compensation to those persons who suffered a particular injury from the nuisance. But public property, we think, does not fall within the protection of the Constitution. " Id . at 328-29, 88 S.E. at 807 (emphasis added) (citations omitted). The court went on to hold that because the Act did not expressly delegate to the power company the right to flood the particular county road at issue, the county could sue the power company for damages. Id. at 330, 88 S.E. 801
SCDOT and the City claim Edgefield County shores up their position. The County-unsurprisingly-deems the "public property" remark dictum. Whether the statement in Edgefield County rises (or sinks) to the level of dictum is not important to our task today. What is important is our supreme court has once before explained the scope of the State's eminent domain power and its interplay with the Takings Clause in the context of an alleged condemnation of public property. Yaeger v. Murphy , 291 S.C. 485, 490 n.2, 354 S.E.2d 393, 396 n.2 (Ct. App. 1987) ("[T]hose who disregard dictum, either in law or in life, do so at their peril.").
Several other states have held "private property" as used in the state takings clauses of their state constitutions does not include property owned by political subdivisions of a state. See Bd. of Water Works Trs. of City of Des Moines v. SAC Cty. Bd. of Supervisors , 890 N.W.2d 50, 71 (Iowa 2017) ; Metro. St. Louis Sewer Dist. v. City of Bellefontaine Neighbors , 476 S.W.3d 913, 916-17, 923 (Mo. 2016) (en banc) (finding sewer district failed to state a claim for inverse condemnation and rejecting its argument that "this [c]ourt should interpret the words 'private property' as used in article I, section 26 [of the Missouri Constitution] to include 'public property' that is damaged by other unrelated public entities").
B. Federal Takings Law
The County is right that we have relied on federal common law in interpreting South Carolina's Takings Clause. Hardin v. S.C. Dep't of Transp. , 371 S.C. 598, 604, 641 S.E.2d 437, 441 (2007). The United States Supreme Court has held the federal Takings Clause applies when the federal government takes public land owned by a state or its political subdivisions. See United States v. 50 Acres of Land , 469 U.S. 24, 31, 105 S.Ct. 451, 83 L.Ed.2d 376 (1984) ("[I]t is most reasonable to construe the reference to 'private property' in the Takings Clause of the Fifth Amendment as encompassing the property of state and local governments when it is condemned by the United States.").
But we have never looked to federal law for the meaning of private property as used in Article I, § 13. The decision in 50 Acres of Land is no solace to the County because the Supreme Court has recognized the obligation of just compensation does not arise when a sovereign state transfers public property from one governmental use to another.
*475 United States v. Carmack , 329 U.S. 230, 242 n.12, 67 S.Ct. 252, 91 L.Ed. 209 (1946) ; see also Tex. Dep't of Transp. v. City of Sunset Valley , 146 S.W.3d 637, 645 n.2 (Tex. 2004) (citations omitted) ("The City cites several cases from other states that it contends support a municipality's constitutional right to compensation from the state. Those cases, however, are either distinguishable in that they involved statutorily created eminent-domain rights, or inapposite in their reliance on federal authority. The relationship between a city and state, which are not separate sovereigns, is not analogous to that between the federal government and a state.").
C. The Takings Clause and Home Rule
There is another basis for upholding dismissal of the County's inverse condemnation claim against SCDOT. As a state-created agency, SCDOT is an arm of the state. Riley v. S.C. State Highway Dep't , 238 S.C. 19, 24, 118 S.E.2d 809, 810 (1961). Like SCDOT, the County is a creature of the state. Political subdivisions of the state have no ancestor other than the state and its citizens, nor do they possess a separate sovereignty. See Hibernian Soc'y v. Thomas , 282 S.C. 465, 472-73, 319 S.E.2d 339, 343-44 (Ct. App. 1984) ; see also City of Trenton v. State of New Jersey , 262 U.S. 182, 185-87, 43 S.Ct. 534, 67 L.Ed. 937 (1923). Accordingly, we hold the County may not bring an inverse condemnation claim against its "creator," the state. Richland Cty. Recreation Dist. v. City of Columbia , 290 S.C. 93, 95, 348 S.E.2d 363, 364 (1986) ; City of Reno v. Washoe County , 94 Nev. 327, 580 P.2d 460, 463 (1978) ("[T]he City, as a political subdivision of the State, may not raise the issues of taking of property without due process of law or just compensation and the impairment of its contracts, as against the State, its creator.").
The County contends that, as far as the Takings Clause is concerned, its symbiotic relationship with the State was severed by the enactment of Home Rule. The County notes Home Rule granted it the right to own property in its own name, S.C. Code Ann. § 4-1-10(2) (1986), and the Home Rule Amendments to our constitution require constitutional provisions such as the Takings Clause to be "liberally construed" in favor of local government, S.C. Const. art. VIII, § 17.
The County's argument disfigures the Home Rule concept. Nothing in the Home Rule Amendments changed the reality that counties were created by the State, nor did Home Rule endow counties with a separate sovereignty for purposes of the Takings Clause. Knight v. Salisbury , 262 S.C. 565, 570, 206 S.E.2d 875, 876-77 (1974) ("State Constitutions are not grants of power to the General Assembly but are restrictions upon what would otherwise be plenary power."); see Underwood, The Constitution of South Carolina, Volume II: The Journey Toward Local Self-Government 177 (analyzing framers' debates concerning Home Rule Amendments and noting Article VIII, section 17 did not "reverse the traditional view that local governments in this country do not possess inherent power. Subdivisions still have only such power as the state grants either in the constitution or statutes ...").
III.
The County next claims it is entitled to compensation under the Eminent Domain Procedure Act (the Act), S.C. Code Ann. §§ 28-2-10 to -510 (2007 & Supp. 2018). The County contends it is covered by the Act because the definitional sections of the Act include a public entity as a "person" and, consequently, a condemnee. See S.C. Code Ann. § 28-2-30(6), (16) (2007). The County further asserts that because the General Assembly intended that all exercises of eminent domain occur through the Act, the Act entitles the County to just compensation. S.C. Code Ann. §§ 28-2-20, -90 (2007).
We again disagree. First, the definitional sections of the Act cannot supplant the plain meaning of private property as used in Article I, § 13.
Second, the exclusivity the Act refers to "contemplates that the exclusiveness shall only apply to those cases or situations which are embraced within the machinery of the condemnation statutes." Godwin v. Carrigan , 227 S.C. 216, 225, 87 S.E.2d 471, 475 (1955). At least as to the fundamental issue of whether a taking of private property has occurred, the architecture and remedies of the Act cannot be superimposed on an inverse condemnation claim, which springs *476 from the Constitution. See Vick v. S.C. Dep't of Transp. , 347 S.C. 470, 479-81, 556 S.E.2d 693, 698-99 (2001) (rejecting SCDOT's argument that statutory interest rate set forth in Act controlled in inverse condemnation action); cf. Cobb v. S.C. Dep't of Transp. , 365 S.C. 360, 365, 618 S.E.2d 299, 301 (2005) ("In light of the historical treatment of an inverse condemnation action as equivalent to an eminent domain case, we conclude [the] statutory right to a jury trial on the issue of compensation applies as well in inverse condemnation actions."). The General Assembly was careful to note the Act was not designed to "alter the substantive law of condemnation," which includes the doctrine of inverse condemnation. S.C. Code Ann. § 28-2-20 (2007). It is called inverse condemnation because the normal taking procedure has been inverted: the government has taken private property without initiating the formal condemnation process of the Act. Hawkins v. City of Greenville , 358 S.C. 280, 290, 594 S.E.2d 557, 562 (Ct. App. 2004) ; S.C. State Highway Dep't v. Moody , 267 S.C. 130, 136, 226 S.E.2d 423, 425 (1976). Therefore, the Act does not affect our conclusion that the term private property as used in the Takings Clause of the South Carolina Constitution does not include public property.
IV.
As its final argument, the County insists public policy compels us to find the Takings Clause reaches the inverse condemnation of public property because of the fiscal burdens such takings inflict. The County notes courts have relied upon the policy of burden-sharing in explaining the reason for awarding just compensation for the exercise of eminent domain. Sea Cabins on the Ocean IV Homeowners Ass'n v. City of N. Myrtle Beach , 345 S.C. 418, 429, 548 S.E.2d 595, 601 (2001) ("The purpose of the Takings Clause is to prevent the government 'from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " (quoting Armstrong v. United States , 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960) ) ). The United States Supreme Court found this policy strong enough to override the plain meaning of private property in the Fifth Amendment. 50 Acres of Land , 469 U.S. at 31, 105 S.Ct. 451 ("When the United States condemns a local public facility, the loss to the public entity, to the persons served by it, and to the local taxpayers may be no less acute than the loss in a taking of private property."). Commentators have debated the practical sense of requiring just compensation for intergovernmental takings. Schill, Intergovernmental Takings and Just Compensation: A Question of Federalism , 137 U. Pa. L. Rev. 829 (1989) ; Payne, Intergovernmental Condemnation As A Problem in Public Finance , 61 Tex. L. Rev. 949 (1983) ; Note, The Sovereign's Duty to Compensate for the Appropriation of Public Property , 67 Colum. L. Rev. 1083, 1110 (1967).
We conclude the controlling public policy here was ratified by the people and enshrined in South Carolina's Takings Clause, whose reference to private property we have held does not include public property. We cannot stretch the meaning to match a party's public policy preference, even if we agreed with it, for our limited role is to say what the law is, not what it should be. Gaud v. Walker , 214 S.C. 451, 481, 53 S.E.2d 316, 329 (1949) ("Our duty is to declare the law, not to make it.").
The order of the circuit court dismissing the County's inverse condemnation claim is
AFFIRMED.
KONDUROS and MCDONALD, JJ., concur.