**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 21-1352**

───────────

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

8.929 ACRES OF LAND IN ARLINGTON COUNTY, VIRGINIA; ARLINGTON COUNTY, VIRGINIA,

        Defendants – Appellants,

and

FIBERLIGHT, LLC; VERIZON BUSINESS NETWORK SERVICES INC.; WASHINGTON GAS; VERIZON VIRGINIA, LLC; JONES UTILITIES CONSTRUCTION, INC.; DOMINION VIRGINIA POWER; UNKNOWN OWNERS,

        Defendants.

───────────

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Leonie M. Brinkema, District Judge.  (1:20-cv-00667-LMB-JFA)

───────────

Argued:  March 10, 2022                           Decided:  June 1, 2022

───────────

Before AGEE, RUSHING, and HEYTENS, Circuit Judges.

───────────

Vacated and remanded by published opinion.  Judge Agee wrote the opinion, in which Judge Heytens joined. Judge Rushing wrote an opinion concurring in the judgment.

**ARGUED:** James Michael Auslander, BEVERIDGE & DIAMOND PC, Washington, D.C., for Appellants. Allen M. Brabender, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** MinhChau Corr, Acting County Attorney, COUNTY ATTORNEY'S OFFICE, Arlington, Virginia; Gus B. Bauman, BEVERIDGE & DIAMOND, P.C., Washington, D.C., for Appellant. Todd Kim, Assistant Attorney General, Eugene N. Hansen, Environment and Natural Resources Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

2

AGEE, Circuit Judge:

By grant of summary judgment in favor of the United States, the district court held that the Government's provision of substitute facilities to Arlington County, Virginia ("the County") constituted just compensation for the taking of three parcels of property. The County appeals, contesting the district court's application of the summary judgment standard and raising several substantive arguments in support. Finding error in the district court's grant of summary judgment, we vacate the district court's ruling and remand for further proceedings consistent with this opinion.

I.

Absent expansion, the Arlington National Cemetery ("the Cemetery") is estimated to reach capacity by the early 2040s.[1] In an effort "to maximize interment space at [the Cemetery]," Congress authorized the Arlington National Cemetery Southern Expansion Project and the Defense Access Roads Project (collectively, "the Project") in 1999. Over the course of the following decades, the County and the Government engaged in negotiations over the Project, particularly as to its impact on "8.929 acres of land in

---

[1] Mindful of the standard on summary judgment, we recite the facts in the light most favorable to the non-moving party, the County. *Garofolo v. Donald B. Heslep Assocs., Inc.*, 405 F.3d 194, 198 (4th Cir. 2005).

3

Arlington County, Virginia owned by the County," J.A. 179—namely, Southgate Road,

South Joyce Street, and a segment of Columbia Pike,[2] as depicted below:



J.A. 505.[3] Relevant here, Southgate Road is part of a 4.23-acre property that substantially

functions as a publicly accessible road to Joint Base Myer-Henderson Hall, with 3.6 acres

---

[2] Generally, in Virginia, the Virginia Department of Transportation owns the roadway system. However, the County owns the roads at issue in this appeal, albeit to varying extents, as discussed in more detail below.

[3] The outlined portion of the image represents the Project's boundary line.

of it apportioned for the road and parking, and the additional acreage "consist[ing] of a portion of the parking lot and some grassland." J.A. 181, 687. In contrast, Columbia Pike

> is a primary route to the Pentagon. It's a primary connection between the whole Columbia Pike corridor and Pentagon City, Crystal City, Potomac Yard. It is the highest ridership bus line . . . in Arlington, with connections to Metro stations. So there are as few connections as important to Arlington from an arterial street perspective.

J.A. 428–29. The County owned both Southgate Road and Columbia Pike in fee simple. Finally, South Joyce Street "is an extension of Southgate Road[] [that] passes beneath I-395 and connects Columbia Pike with Pentagon City," J.A. 286, over which the County owned an easement "for the operation and maintenance of a public right of way," J.A. 179.

## A.

To frame our discussion of the parties' negotiations, as relevant to the appeal, we begin with an overview of the County's acquisition and ownership of Southgate Road.

The County acquired Southgate Road by separate deeds from the Government in 1956 and 1963. Although the 1956 deed appears to require that Southgate Road be used "to maintain the project constructed thereon," J.A. 549—which is presumably a reference to "the construction of the Navy Annex Access Road, Defense Access Project DA-NR-39" (as discussed earlier in the deed), J.A. 546—the County owned the parcel in fee simple prior to the date of the taking. Southgate Road also held an S-3A zoning designation under the Arlington County Zoning Ordinance, which "is very restrictive, and its permitted uses promote low-density housing or government/institutional uses." J.A. 276. In line with these zoning limitations, Southgate Road has been utilized only as a publicly accessible road since the late-1940s.

5

Over the course of the underlying litigation, as more fully discussed below, the County discussed development of Southgate Road because, even though "there ha[d] not been a demonstrated market of sellers and buyers for land zoned S-3A," J.A. 276, it "makes final decisions on rezoning and re-planning of real property in Arlington County," J.A. 182. The County represents that "it is reasonable to expect that Arlington County would approve a rezoning and general land use plan amendment to allow for residential development at the Southgate Parcel." J.A. 337. After such re-planning and rezoning, Southgate Road would be "desirable to the private sector." J.A. 300.[4]

The County obtained an appraisal in June 2020 reflecting that Southgate Road held a determinable market value of approximately $21 million. As Andrew VanHorn, the County's commercial real estate development expert, opined:

> The Southgate Parcel is highly marketable for development. The Southgate Parcel is a highly desirable parcel of land given its location proximate to a rapidly growing employment center in National Landing (within Pentagon City and Crystal City in Arlington County and Potomac Yard in the City of Alexandria)[,] multiple Metrorail stations (Pentagon and Pentagon City), and the existing residential townhome community of Foxcroft Heights. Townhome supply in Arlington is extremely limited while the townhome product is one of the most desirable housing products in Arlington due to the size and price point for buyers.

---

[4] Nonetheless, the parties stipulated for purposes of the underlying litigation that before the Government initiated this condemnation proceeding, "[the] County had not ever sought to sell the Southgate Road Parcel[;]" "[the] County had not ever attempted to put the Southgate Road Parcel to some use other than a publicly accessible road, for utilities, for parking, and for open space[;]" "no developer had ever approached the County about developing the Southgate Road Parcel with a residential or commercial use[;]" and "the County did not advertise the Southgate Road Parcel as available for development with a residential or commercial use." J.A. 182.

6

J.A. 334; *see also* J.A. 335 (VanHorn opining that "pricing indicates that there is significant demand for [townhome development], which remains a discount to new single family housing in Arlington County"). And the demand for such housing was only expected to increase with the anticipated completion of an Amazon.com, Inc. headquarters in the vicinity. The County thus obtained two development plans for Southgate Road, one involving the construction of 52 townhomes and another including 28 townhomes and 70 multifamily units.

The County contends it never pursued any such developments prior to the taking of Southgate Road by the Government because that parcel was "frozen for a number of years" due to the ongoing negotiations over the Project. J.A. 427.

B.

In 2008, the Government and the County discussed a land-exchange proposal to advance the Project, which involved the Cemetery subsuming Southgate Road ("the 2008 Proposal"). However, this arrangement did not come to fruition because the land the County was to receive in exchange for Southgate Road was transferred to the U.S. Army.

In 2013, the parties contemplated another land-exchange proposal related to Southgate Road ("the 2013 Proposal"). In that Proposal, the Government "offered the County a broader land exchange and road realignment agreement in which the County would receive a much greater amount of land on the south side of Columbia Pike." J.A. 603. These negotiations contemplated creating a new road (South Nash Street) to mitigate

7

traffic concerns from closing Southgate Road and to provide replacement base access.[5] The Government subsequently terminated negotiations because it "determined that a land exchange was not in the best interests of the United States." J.A. 508.

Abandoning the idea of a land-exchange agreement, the parties considered an alternative arrangement in or around 2014 in the form of substitute facilities as just compensation.[6] To that end, they engaged in discussions over a conceptual design for the Project, which they envisioned would:

> (1) realign [the County-owned portions of] Columbia Pike and South Joyce Street, (2) close portions of Southgate Road and South Joyce Street (and incorporate this land into the Cemetery), (3) construct a new north-south South Nash Street; (4) provide new on and off-ramps to Washington Boulevard, and (5) relocate the Cemetery's operations complex to south of the realigned Columbia Pike (near I-395).

---

[5] South Nash Street was to run north-south along the open parcel near the Air Force Memorial (the far-left portion of the Project's boundary line depicted in the above image).

[6] We note that the concept of just compensation was relevant throughout the parties' negotiations because the Government cannot take private property for public use "without just compensation." U.S. Const. amend. V; *see also* The Interagency Land Acquisition Conference, Uniform Appraisal Standards for Federal Land Acquisitions 3 (Appraisal Found. ed. 2016) [hereinafter Yellow Book], https://www.justice.gov/file/408306/download (saved as ECF opinion attachment) ("Just compensation must be paid for property acquired for public purposes, whether by voluntary purchase, land exchange, or the power of eminent domain."). We refer to the Yellow Book throughout our analysis because its "federal Standards, frequently cited in legislation and court rulings, have guided the appraisal process in the valuation of real estate in federal acquisitions since their original publication . . . in 1971." John C. Cruden, *Foreword to* Yellow Book, at 1; *see, e.g.*, *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1066–67 (9th Cir. 2010) (relying on the Yellow Book's definition of "highest and best use"); *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1181 (9th Cir. 2000) (same); John D. Dingell, Jr. Conservation, Management, and Recreation Act, Pub. L. No. 116-9, 133 Stat. 580 (2019) (directing use of the Yellow Book for various projects involving the management and conservation of natural resources on federal lands).

8

J.A. 180. The following diagram details an aerial-view of this design plan:



J.A. 506.

The parties contemplated that the closure of Southgate Road would increase traffic flow on the roads in the neighboring Foxcroft Heights community and on Columbia Pike. The County did not favor such an outcome. *See* J.A. 449–50 (Dennis Leach, the County's Director of Transportation for the Department of Environmental Services, confirming that "it would not be desirable to have even more base traffic" on the Foxcroft Heights roads as a result of Southgate Road's closure"); J.A. 591 (the County asserting that "the closure of Southgate Road will force additional traffic on to, and further constrain, Columbia Pike").

9

To address this concern, the Proposal suggested adding South Nash Street to mitigate traffic flow through Foxcroft Heights and maintain direct base access. While the County initially "wanted" the Government to construct this road "prior to demolishing Southgate Road," J.A. 451, the County would later insist that it did not require the Government to quell the traffic implications in the Foxcroft Heights neighborhood. The County represented that it had "other traffic calming methods it could [have] implement[ed] to discourage traffic from using the . . . streets in Foxcroft Heights to access the Base." J.A. 603. The County instead viewed South Nash Street as a "federal amenity," J.A. 98, that "[did] not address any need of the County, nor [did] it have any significance to the public interests of the County," J.A. 58, because South Nash Street would substantially serve the Government's interests—namely, access to the base.[7]

To accommodate the increased traffic on Columbia Pike, the negotiations involved realigning a segment of that roadway. The parties fundamentally recognized that realignment—instead of closure—of Columbia Pike was necessary to avoid catastrophic traffic consequences. *See* J.A. 433 (Leach confirming that "[i]f the United States were to just close Columbia Pike completely . . . and convert that land to cemetery use, without building any replacement," "it would be extremely damaging to the transportation network and to the community"). And while the County had already planned improvements to its segment of Columbia Pike that "likely would have occurred irrespective of" any agreement

---

[7] The County consistently declined the Government's offer to convey South Nash Street to the County in fee simple, instead insisting only on conveyance of an easement.

with the Government, J.A. 604, the County could not construct a full replacement of that portion of Columbia Pike:

> Q.    So let's say that instead of building [South Nash Street], the federal government just gave Arlington County cash for Arlington County to build or enhance its road network to replace this portion of Columbia Pike. Is there any place that the county could have built a replacement road or enhanced its road network to replace losing this section of Columbia Pike?
>
> . . .
>
> A.    [I]t's not a feasible alternative. . . . Given the geographic and physical attributes of this part of Arlington, there is no natural replacement to . . . this segment of Columbia Pike.

J.A. 433–34. Accordingly, the Government represented it could construct a realigned segment of Columbia Pike featuring widened lanes to support the increase in traffic from the closure of Southgate Road—along with newly created bike paths, streetscapes with trees and streetlights, and sidewalks.

The Proposal also involved building a new parking garage to compensate for the loss of parking on Southgate Road and accommodating the County's existing sanitary system. The utilities relocation, burying of overhead power lines, and all roadway improvements were estimated to cost more than $54 million, while the cost to construct the new segment of Columbia Pike and build South Nash Street was expected to total $23.4 million. Upon completion, the Government intended to convey the new segments of these roadways—consisting of approximately five acres—to the County.

The County approved of the design's utility. And while it agreed that the replacement roadway system provided sufficient compensation for Columbia Pike and

11

South Joyce Street, the County did not concede just compensation for Southgate Road. J.A. 58 ("The County expects just compensation for the Southgate Road right of way."). It asserted that fair market value was the proper form of just compensation for Southgate Road because it "had a determinable market value." J.A. 182. The Government responded that "the appropriate measure of just compensation for the County's property interests in the road network [as a whole was] substitute facilities." J.A. 860.

C.

Having reached an impasse on the issue of just compensation for Southgate Road, the Government commenced condemnation proceedings as to it, Columbia Pike, and South Joyce Street, identifying the three parcels as the "Subject Property" in its Complaint. J.A. 17; *see* J.A. 29–30. The Complaint represented that "as just compensation for the estates in property acquired herein, the sum of Ten Dollars ($10.00) will be deposited into the Registry of the Court, and substitute facilities will be constructed by the United States." J.A. 50. By operation of law, the Government received title to the property by virtue of the condemnation proceeding with any issues of compensation to be later determined. *See* 40 U.S.C. § 3114(b)–(c). In its answer, the County timely demanded "a jury trial of all issues so triable." J.A. 78.

The Government subsequently moved for the district court "to determine that the fair market value measure of determining just compensation ha[d] no relevance to this condemnation proceeding" under Federal Rule of Civil Procedure 71.1, which governs condemnation proceedings. J.A. 211. It argued "that it [didn't] matter whether [the County's] expert [said] [Southgate Road was] worth $1 or [$]100 million, it just [didn't]

12

have relevance, because in this case the United States has provided substitute facilities."

J.A. 123. After inquiring about how the Government could "determine that a substitute

facility equates to just compensation . . . without having some sense of the value of the

property that's being traded," J.A. 123, the district court denied the Government's motion

as "premature," J.A. 140. The parties proceeded with discovery and filed a joint factual

stipulation to narrow the issues for trial.

At the close of discovery, the Government moved for summary judgment under

Federal Rule of Civil Procedure 56 on the issue of just compensation. The district court

conducted a hearing on the motion, at which it determined that the case largely hinged on

how the taking was characterized—whether it should "be considered holistically or

whether it should be split" between the parcels, J.A. 84. As the court explained,

> [T]he driving, the major aspect of this project is the realignment of Columbia
> Pike. There's already been an agreement that the substitute facilities for that
> are absolutely acceptable. My understanding is there's no dispute about that.
>
> And so if the Court finds that the Southgate street and the South Nash[8] road
> are part of that overall project, you can't separate it from the changes to
> Columbia Pike, then since there's no law that provides for what we will call
> hybrid resolution, that is, cash plus substitute property, the substitute
> facilities is the proper way to resolve this case.
>
> I don't think you get to the other issue about . . . what is the proper valuation,
> because . . . it's already been determined that . . . the biggest proportion of
> this overall project can only be done through substitution.

J.A. 102–03.

---

[8] Given the context of its comments, which centered on the condemned parcels, the
court likely meant to refer to South Joyce Street, not South Nash Street.

13

Applying this rationale, the court granted summary judgment in favor of the Government. Ruling from the bench,[9] it made several findings of fact, including "that this is a project involving interconnected roadways," such that "South Nash Street [would] help[] Arlington County in avoiding th[e] impact" of increased traffic in the Foxcroft Heights neighborhood once the Cemetery incorporated Southgate Road. J.A. 108–09. On this point, the court relatedly

> [found] that it is one holistic project that can't be split into separate sections and that there has been a significant agreement already as to the Columbia Pike portion of the project . . . So having found that it is one project, one form of compensation is the way to handle it.

J.A. 108. The court thus concluded that "the substitute facilities will provide . . . just compensation for the taking of the Southgate Road" because they included the "redevelopment of Columbia Pike" (to include a "much safer bike lane") and "the substitution of the South Nash road." J.A. 109–10. Finally, addressing the County's development plans for Southgate Road, the court remarked,

> it is interesting that the Southgate Road and the area around it, which I think has only been used for parking, has been in that configuration for 40 or 50 years at least, so . . . that particular area of Arlington County hasn't been used for anything else for years. And it's quite inchoate as to whether or not [Southgate Road] would ever really be developed into residential property[.]

J.A. 110.

The County timely noted an appeal. We have jurisdiction under 28 U.S.C. § 1291.

---

[9] The court did not memorialize its reasoning in a written opinion or order.

14

II.

On appeal, the County raises several substantive arguments, including that the Government was not entitled to unilaterally characterize the taking of the parcels as a singular project and, in turn, determine that the substitute facilities doctrine was the appropriate form of just compensation. Underlying the County's various arguments is also the running contention that the district court exceeded its summary judgment authority by resolving genuine disputes of material fact.

We agree with the County that the district court circumvented the summary judgment standard when it engaged in fact finding despite the presence of genuinely disputed material facts. For that reason, we vacate the judgment of the district court and remand for proceedings consistent with this opinion.

A.

We begin by addressing a preliminary matter that involves the unique judicial posture of the intersection of the rules established for condemnation proceedings in Federal Rule of Civil Procedure 71.1 with the standard for summary judgment in Federal Rule of Civil Procedure 56.

In general, the Federal Rules of Civil Procedure "govern proceedings to condemn real and personal property by eminent domain, except as [Rule 71.1] provides otherwise." Fed. R. Civ. P. 71.1(a). Relevant here, that rule provides,

(1)    In an action involving eminent domain under federal law, the court tries all issues, including compensation, except when compensation must be determined:

(A)    by any tribunal specially constituted by a federal statute to determine compensation; or

(B)    if there is no such tribunal, by a jury when a party demands one within the time to answer or within any additional time the court sets, unless the court appoints a commission.

*Id.* R. 71.1(h)(1). The Supreme Court has explained the contours of this provision:

> [T]he Rule's basic structure makes clear that a jury in federal condemnation proceedings is to be confined to the performance of a single narrow but important function—the determination of a compensation award within ground rules established by the trial judge. . . . [W]hen a jury is afforded, the sweeping language of the final sentence of the Rule discloses a clear intent to give the district judge a role in condemnation proceedings much broader than he occupies in a conventional jury trial. It is for him to decide "all issues" other than the precise issue of the amount of compensation to be awarded. It follows that it is for the judge to tell the jury the criteria it must follow in determining what amounts will constitute just compensation, and that in order to do so he must decide . . . preliminary matter[s].

*United States v. Reynolds*, 397 U.S. 14, 20 (1970); *see also United States v. 105.40 Acres of Land*, 471 F.2d 207, 212 (7th Cir. 1972) ("The judge should . . . instruct the jury on the issue of just compensation, consistent with his preliminary factual determination.").

Such "preliminary matter[s]" might, for example, consist of those resolved on summary judgment. That is to say, a party to a condemnation proceeding may move for summary judgment under Rule 56. *See E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 823 (4th Cir. 2004) ("[T]he regular rules of civil procedure apply when Rule 71A[10] is silent."); *Transcon. Gas Pipe Line Co., LLC v. Permanent Easements for 2.14 Acres & Temp.*

---

[10] Rule 71.1 was previously numbered 71A.

16

*Easements for 3.59 Acres*, 907 F.3d 725, 739 (3d Cir. 2018) ("[S]ubsection (a) of Rule 71.1 incorporates the other Federal Rules of Civil Procedure . . . in condemnation proceedings to the extent Rule 71.1 does not govern."); *see also Etalook v. Exxon Pipeline Co.*, 831 F.2d 1440, 1446–47 (9th Cir. 1987) (applying the summary judgment standard to the issues of "valuation and damages" in a condemnation case).

The summary judgment standard is well-established. "We review a district court's decision to grant summary judgment de novo, applying the same legal standards as the district court, and viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." *Carter v. Fleming*, 879 F.3d 132, 139 (4th Cir. 2018) (citation omitted). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"[A] factual dispute is genuine only where the [non]movant's version is supported by sufficient evidence to permit a reasonable jury to find in its favor." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (citation and internal quotation marks omitted). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (citation omitted). If the movant satisfies his initial burden to demonstrate "an absence of evidence to support the nonmoving party's case," the burden

shifts to the nonmovant to "present specific facts showing that there is a genuine issue for trial." *Humphreys & Partners Architects*, 790 F.3d at 540 (citations and internal quotation marks omitted). In so doing, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Instead, the nonmoving party must establish that a material fact is genuinely disputed by, *inter alia*, "citing to particular parts of the materials of record." Fed. R. Civ. P. 56(c)(1)(A).

We consider this standard here because, in the ruling on appeal, the Government expressly moved for summary judgment under Rule 56 rather than requesting disposition or proceeding to trial under Rule 71.1. M. for Summ. J. at 1, *United States v. 8.929 Acres of Land*, No. 1:20-cv-00667-LMB-JFA (E.D. Va. Jan. 26, 2021), ECF No. 100 (requesting summary judgment under Rule 56); Mem. in Support of M. for Summ. J. at 20, *United States v. 8.929 Acres of Land*, ECF No. 101 (detailing the summary judgment standard). We thus conduct our review de novo under the summary judgment standard as no part of Rule 71.1 directs us to the contrary.[11]

---

[11] Although the Government cites *International Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Etrangers a Monaco*, 329 F.3d 359 (4th Cir. 2003), to contend that clear-error review is applicable for the district court's factual findings, its position is misguided. In that case, we reviewed the district court's findings of fact for clear error even though the matter was disposed of on summary judgment because (1) "the parties, having prepared for a bench trial, *agreed to submit the voluminous record to the court for dispositive decision* at the time of the summary judgment motions"; and (2) "the court's disposition of the case was consistent with the fact that the parties did not contradict one another's proffered facts, but only disputed the inferences that a fact finder would draw

B.

Applying the foregoing standard, we turn to the core of this appeal. We begin by providing a brief overview of the concept of just compensation to frame our discussion. We then consider the district court's findings of fact, concluding that certain fact-finding constituted reversible error at the summary judgment phase.

1.

"The Fifth Amendment requires that the United States pay 'just compensation' . . . whenever it takes private property for public use." *United States v. 50 Acres of Land* (*Duncanville*), 469 U.S. 24, 25–26 (1984). "The [Supreme] Court has repeatedly held that just compensation normally is to be measured by 'the market value of the property at the time of the taking contemporaneously paid in money.'" *Id.* at 29 (quoting *Olson v. United States*, 292 U.S. 246, 255 (1934)). This sum is typically "measured by the use that would bring the highest price—the 'highest and best' use." *United States v. 69.1 Acres of Land*, 942 F.2d 290, 292 (4th Cir. 1991).

Generally, a property's current function "is presumed to be" its highest and best use. *Id.* However, if "a landowner posits that a different use is 'highest and best,' he must show that this use is 'reasonably probable' and that the probability has a real market value." *Id.*; *see also* Yellow Book 102 (defining "highest and best use" as "[t]he highest and most

---

from those underlying facts." *Id.* at 362. The first reason we provided for employing the clear-error standard in that case summarily halts our review of its application here. Quite simply, the parties in this case did not agree to a dispositive decision on summary judgment. Accordingly, we decline to review the district court's factual findings for clear error.

19

profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future"). As the Supreme Court has explained:

> Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable should be excluded from consideration for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value—a thing to be condemned in business transactions as well as in judicial ascertainment of truth.

*Olson*, 292 U.S. at 257; *see also* Yellow Book 102–03 ("[I]n determining a property's highest and best use, each potential use must be analyzed using four criteria: (1) physical possibility, (2) legal permissibility, (3) financial feasibility[,] and (4) degree of profitability."). Accordingly, "[t]he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered . . . to the full extent that the prospect of demand for such use affects the market value." *Olson*, 292 U.S. at 255. Notably, "[t]he owner may introduce evidence of the highest and best prospective use even though he has no plans to sell the property or utilize it for that use." *Bd. of Cnty. Supervisors v. United States*, 276 F.3d 1359, 1366 (Fed. Cir. 2002) (quoting 5 J. Sackman, Nichols on Eminent Domain § 18.05[3] (rev. 3d ed. 2001)).

Diverging from fair market value as just compensation has been justified "when market value has been too difficult to find, or when its application would result in manifest injustice to owner or public." *United States v. Commodities Trading Corp.*, 339 U.S. 121, 123 (1950). In other words, deviating from this normal valuation regime may be appropriate in cases involving highly unique circumstances, as the Supreme Court "has refused to make a fetish even of market value, since it may not be the best measure of value

20

in some cases." *United States v. Cors*, 337 U.S. 325, 332 (1949); *see also* 8 S.W. Moore, Nichols on Eminent Domain § G14A.03 (rev. 3d ed. Mar. 2022 update) ("The goal, it should be remembered, is just or full compensation, not a rigid computation of fair market value."). "Such cases, for the most part, involve properties that are seldom, if ever, sold in the open market," *Duncanville*, 469 U.S. at 30, including "public facilities" in the form of "roads or sewers," *United States v. 564.54 Acres of Land*, 441 U.S. 506, 513 (1979).

In particular circumstances, substitute facilities may be the appropriate measure of just compensation. *Brown v. United States*, 263 U.S. 78 (1923), "[is] the source of what has become known as the 'substitute-facilities doctrine.'" *Duncanville*, 469 U.S. at 31–32. There, the Supreme Court dealt with "peculiar" facts warranting substitute facilities as just compensation. *Brown*, 263 U.S. at 81.

In *Brown*, reservoir construction on the Snake River led to the flooding of approximately three-quarters of the town of American Falls, Idaho. *Id.* at 80. To provide just compensation to the owners of the flooded property, the Government planned to relocate most of the town to the other side of the river, which would require the Government to take property from private individuals to construct the new town. *Id.* at 80–81. Owners of a portion of the property in the relocated town challenged the Government's takings power, asserting that the subsequent transfer of their property to other persons failed to qualify as a "public use" under the Fifth Amendment. *Id.* at 81.

The Supreme Court disagreed, concluding that the substitutionary form of just compensation was appropriate under the circumstances:

21

The usual and ordinary method of condemnation of the lots in the old town, and of the streets and alleys as town property, would be ill adapted to the exigency. It would be hard to fix a proper value of homes in a town thus to be destroyed, without prospect of their owners' finding homes similarly situate on streets in another part of the same town, or in another town near at hand. It would be difficult to place a proper estimate of the value of the streets and alleys to be destroyed and not to be restored in kind. A town is a business center. It is a unit. If three-quarters of it is to be destroyed by appropriating it to an exclusive use like a reservoir, all property owners, both those ousted and those in the remaining quarter, as well as the state, whose subordinate agency of government is the municipality, are injured. A method of compensation by substitution would seem to be the best means of making the parties whole. The power of condemnation is necessary to such a substitution.

*Id.* at 82–83.

The Supreme Court revisited *Brown*'s principles in *Duncanville*, which involved the taking of a landfill in Duncanville, Texas. 469 U.S. at 26. The City of Duncanville argued that, as a public entity, it was automatically entitled to compensation for the cost of acquiring the substitute site it purchased, which was more expensive and valuable than the original facility. *Id.* The Supreme Court rejected this argument, holding that "[n]othing in *Brown* implies that the Federal Government has a duty to provide the city with anything more than the fair market value of the condemned property." *Id.* at 33. Further, the Court noted in dictum that "*Brown* merely indicates that it would have been constitutionally permissible for the Federal Government to provide the city with a substitute landfill site instead of compensating it in cash." *Id.*

Based on this precedent, substitute facilities may be an appropriate form of just compensation when it "would seem to be the best means of making the parties whole." *Brown*, 263 U.S. at 83. In line with its purpose, substitute facilities "cannot, consistently

22

with the Fifth Amendment, be used to deny an owner compensation when a taking has inflicted loss." *California v. United States*, 395 F.2d 261, 266 (9th Cir. 1968).

In cases in which substitute facilities may be the appropriate form of just compensation, the question becomes whether the facilities offered provide the same functional utility as that which was taken. *Town of Clarksville v. United States*, 198 F.2d 238, 242–43 (4th Cir. 1952) ("The taking may be justly compensated by payment of the cost of a substitute, so long as a full equivalent is afforded for the property taken. . . . [W]e are not here dealing with a rigid, blind measure, that grants compensation only on a pound of flesh basis, but rather with an equitable concept of justice and fairness that accords with the Fifth Amendment's mandate. Accordingly, the equivalence requirement which must be met with respect to the substitute facility is more that of utility than of mere dollar and cents value." (internal citations omitted)); *United States v. Certain Prop. Located in Borough of Manhattan, City, Cnty. & State of New York*, 403 F.2d 800, 804 (2d Cir. 1968) ("Exact duplication is not essential; the substitute need only be functionally equivalent. The equivalence required is one of utility."); *United States v. Streets, Alleys & Pub. Ways in Vill. of Stoutsville*, 531 F.2d 882, 887 n.7 (8th Cir. 1976) ("The substitute facilities measure of compensation is used by the courts regardless of whether it produces an award greater or less than the 'value' of the property, so long as the substitute facility is reasonably necessary to meet the needs of the community that had been met by the condemned property.").

Notably, just compensation may be provided *either* by fair market value *or* substitute facilities, but not both. *See Stoutsville*, 531 F.2d at 887 n.7 (explaining that the

23

substitute facilities measure is "an alternative method of compensation that entirely replaces the market value concept where public facilities are concerned"); *Manhattan*, 403 F.2d at 803 (same); Yellow Book 200 ("If the United States provides compensation in the form of a substitute facility, 'the market value of the . . . property is no longer relevant.'"). That is because such an "approach would add uncertainty and complexity to the valuation proceeding without any necessary improvement in the process." *Duncanville*, 469 U.S. at 35; *see also* J.A. 85–86 (the County agreeing with the district court's observation that "there's no case law . . . that supports the concept of hybrid compensation, that is, a combination of substitution of property plus cash").

2.

With this background in mind, we turn to what the district court "found" during the summary judgment proceeding. J.A. 108. When granting summary judgment in favor of the Government from the bench, the district court made two primary findings: (1) that "this is a project involving interconnected roadways" such that "it is one holistic project that can't be split into separate sections"; and, considering one form of just compensation is appropriate per unitary parcel, (2) that "the substitute facilities will provide . . . just compensation for the taking of the Southgate Road" because such compensation included the "redevelopment of Columbia Pike" and "the substitution of the South Nash road." J.A. 108–10. Our analysis begins and ends with the first finding, as there appear to be genuine disputes of material fact underlying this factual lynchpin that cannot be resolved at the summary judgment stage.

24

Specifically, we are persuaded that the district court's interconnected-roadways finding for "one holistic project" impermissibly drew inferences in favor of the movant (the Government) on genuine disputes of material fact. To be sure, Southgate Road, Columbia Pike, and South Joyce Street are connected at a basic level as components of the County's transportation scheme. And a finding of the taking as "one holistic project" could be made if the trier of fact resolves the factual matters in dispute in the Government's favor *on the merits*. But this case was not at the merits stage; it was only before the court on a motion for summary judgment where a different standard applies. Accordingly, when finding that the properties constituted an interconnected roadway and implicitly nothing more, the district court discounted record evidence that could permit a reasonable factfinder to conclude that a portion of the property was not part of a "holistic project" or unitary parcel. That is to say, the County proffered evidence that Southgate Road is not only a road, but also a valuable piece of developable property for purposes of determining just compensation. *See* Reply Br. 10, 16 (the County asserting that whether Southgate Road "is merely a road" or "a valuable piece of property for development" "remains the key factual dispute in this case barring summary judgment").

a.

i.

The Government wields broad authority when demarcating the boundary line for property in condemnation. *United States v. 20.53 Acres of Land*, 478 F.2d 484, 487 (10th Cir. 1973) ("It is elementary that how much or how little property the United States elects to take by condemnation is a legislative, not a judicial, question." (citing *Berman v. Parker*,

25

348 U.S. 26, 35–36 (1954)); *see also Kohl v. United States*, 91 U.S. 367, 374 (1875) ("If the United States have the power [of eminent domain], it must be complete in itself. It can neither be enlarged nor diminished by a State. Nor can any State prescribe the manner in which it must be exercised. The consent of a State can never be a condition precedent to its enjoyment."). As the Supreme Court has explained,

> It is not for the courts to oversee the choice of the boundary line nor to sit in review on the size of a particular project area. Once the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch. . . . It is not . . . the function of the courts to sort and choose among the various parcels selected for condemnation.

*Berman*, 348 U.S. at 35–36 (internal citations omitted); *see also United States v. 21.54 Acres of Land*, 491 F.2d 301, 305 (4th Cir. 1973) ("[T]he discretionary determination by the condemning authority of the extent of the take is not reviewable by the court.").

Both parties recognize this established concept. Indeed, the County does not contest the Government's ability to condemn Southgate Road—or Columbia Pike and South Joyce Street for that matter—for purposes of the Cemetery's expansion. But the County does challenge the Government's characterization of the taking as a single project encapsulating an interconnected roadway system for just compensation purposes—a challenge that implicates novel questions on appeal.

The district court adopted the Government's line of reasoning that if the parcels are only roads that constitute an interconnected roadway for purposes of just compensation, then the substitute facilities doctrine applies as the proper form of just compensation. According to the Government, the unique circumstances of this case demonstrate that the

26

County is unable to mitigate the traffic implications of the taking with cash alone. To that end, the County requires substitute facilities of the taken property in the form of a replacement road network, which suffices as just compensation because, as the County has conceded, it would be functionally equivalent to that which was taken.[12]

In contrast, under the County's rationale, if Southgate Road is predominantly a valuable piece of developable property, it is severable from the other roads involved in the Project, meaning its just compensation determination must be separate and distinct in turn. Given the alleged divisibility of the parcels, the County argues the Government must provide just compensation respectively for each: fair market value for Southgate Road and substitute facilities for both Columbia Pike and South Joyce Street. Accordingly, characterizing the taking as a unified whole or one involving divisible sections is the factual cornerstone issue of this case.

In considering this issue, the district court failed to properly adhere to the summary judgment standard. The court found as undisputed fact that Southgate Road functions solely as a road in an interconnected roadway system despite the contested record evidence—on which a reasonable factfinder could rely—demonstrating that it could also

---

[12] The County expressly conceded the functional utility of the substitute facilities at oral argument. Oral Argument at 37:10–38:00, *United States v. 8.929 Acres of Land* (No. 21-1352) (4th Cir. March 10, 2022), https://www.ca4.uscourts.gov/OAarchive/mp3/21-1352-20220310.mp3 ("[The Court]: If we were to determine that the district court . . . was correct to decide there was a singular taking, it was correct to decide that . . . the substitute facilities theory is appropriate in this case, then the question that would be left for the jury in theory is whether the actual substitute facilities were functionally equivalent as just compensation. And what I understood your answer . . . to be was that that's not something you contest. [The County]: That is correct, Your Honor. There would be no jury trial. [The Court]: So, there would be no question? [The County]: That's correct, Your Honor.").

27

be a valuable piece of developable property. While the court would not have been procedurally barred from making such a finding on the merits under Rule 71.1, the proceeding was only at the summary judgment stage, meaning Rule 56's standard applied.

The parties' negotiations, which the district court observed were "interesting," J.A. 109, reflect that they discussed Southgate Road as a parcel eligible for trade via land-exchange, not simply a road to be packaged with others and replaced by substitute facilities.[13] In both the 2008 and 2013 Proposals, the parties discussed the Cemetery's incorporation of Southgate Road alone in the context of a land exchange. From this, a reasonable factfinder could deduce that negotiations over Southgate Road were historically neither conducted in conjunction with Columbia Pike and South Joyce Street nor with substitute facilities in mind. This could thus be read to support the County's narrative of Southgate Road's function as a separate parcel for purposes of determining just compensation and not necessarily part of a single, holistic tract.

---

[13] Federal Rule of Evidence 408 does not appear to bar this evidence as inadmissible. That rule provides that evidence of a party's "furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim" or evidence of a party's "conduct or a statement made during compromise negotiations about the claim" is "not admissible—on behalf of any party—either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." Fed. R. Evid. 408(a). Assuming consideration of Rule 408 is appropriate despite the Government's failure to raise such an argument on appeal or otherwise, that rule is inapplicable where, as here, there was no disputed claim at the time the statement in question was made. *United States v. 320.0 Acres of Land*, 605 F.2d 762, 824–25 (5th Cir. 1979) ("[A]t the time the statements [were] provided, there [was] no disputed claim, and hence no settlement negotiations of a disputed claim, to serve as the predicate of Rule 408."). In any event, we leave any further consideration of Rule 408 for the district court to conduct in the first instance on remand.

28

Further supporting Southgate Road's separate status is the County's evidence that, unlike Columbia Pike and South Joyce Street, Southgate Road holds a determinable market value. Although the parties disagree on that value (the Government claims a cap of approximately $2 million, and the County asserts that the parcel is worth approximately $21 million), they fundamentally agreed in a pre-trial joint factual stipulation that "[t]he Southgate Road Parcel had a determinable market value at the Date of Taking." J.A. 182. The parties made no such stipulation as to Columbia Pike or South Joyce Street. Thus, a reasonable factfinder could infer from that stipulation that Southgate Road could be separate and distinct from Columbia Pike and South Joyce Street.

The record also demonstrates that, unlike Columbia Pike and South Joyce Street, the County proffered facts to show Southgate Road's highest-and-best use by providing evidence of its developability. As the County's commercial real estate expert, VanHorn, opined:

> The Southgate Parcel is highly marketable for development. The Southgate Parcel is a highly desirable parcel of land given its location proximate to a rapidly growing employment center in National Landing (within Pentagon City and Crystal City in Arlington County and Potomac Yard in the City of Alexandria) multiple Metrorail stations (Pentagon and Pentagon City), and the existing residential townhome community of Foxcroft Heights.

J.A. 334. In line with this assessment, the County proffered two development plans for Southgate Road: one involving the construction of 52 townhomes, and the other proposing the building of 28 townhomes and 70 multifamily units.

These factual representations demonstrate genuine disputes over the nature of Southgate Road. Drawing all reasonable inferences in favor of the County, they reflect that

29

Southgate Road could be treated as a separate and distinct tract of land that held marketable value as potential development property divorced from any status as a roadway alone.

ii.

These genuine disputes over the classification of Southgate Road are also material because they could impact the outcome of this case under the applicable substantive law. More specifically, should the County prevail on the merits, the taking would be treated as involving two distinct units of property—one for Southgate Road and another for Columbia Pike and South Joyce Street.[14]

"In the one [condemnation] petition any number of parcels of property might be included[.]" *Convers v. Atchison, T. & S.F.R. Co.*, 142 U.S. 671, 674 (1892); Yellow Book 111 (explaining that "[a] single acquisition for government purposes may involve more than one larger parcel . . . for compensation and valuation purposes").[15] As a general rule, the parcels are then categorized by similarity, and "compensation for each [is] assessed separately." *Convers*, 142 U.S. at 674; *see United States v. Hall*, 274 F.2d 856, 859 (9th Cir. 1960) (per curiam) (where "various parcels taken [were] similar in character and use,"

---

[14] Although we recognize that the County's position is not foreclosed as a matter of law, we offer no opinion on its ultimate viability, which is a matter for the district court to determine upon remand under Rule 71.1.

[15] The fact that several parcels are bundled in a single taking as opposed to being divided among separate condemnation proceedings is not determinative of a just compensation award. *See United States v. 2,477.79 Acres of Land*, 259 F.2d 23, 27 (5th Cir. 1958) ("The rights of the landowner should be no greater and no less, and the obligations of the Government should neither be lessened nor increased because a single declaration of taking was filed and a single action brought to determine compensation than would have resulted if the [parcels] had been made the subjects of separate judicial proceedings.").

30

explaining that "[i]n cases . . . involving multiple takings for large governmental projects, it is our understanding that the Rule allows as proper a grouping of similar parcels for consideration, to the end that . . . uniformity in compensation be had"); 29A C.J.S. Eminent Domain § 160 (indicating that just compensation awards must be based in part on "the unique nature of each property"). For instance, courts have separately considered just compensation in a single taking involving "street segments" and "basins and channel[s]," *California*, 395 F.2d at 262 (internal quotation marks omitted), and "streets, sidewalks and alleys" and a "railroad right of way," *Woodville, Okla. v. United States*, 152 F.2d 735, 736–38 (10th Cir. 1946). *But see United States v. City of New York*, 168 F.2d 387, 388, 391 (2d Cir. 1948) (assessing just compensation for the taking of "segments of three public streets, one containing a bridge and trolley line, and two parcels of land under a canal and boat basin" holistically because "no attempt ha[d] been made to show grounds of distinction between the award[s for each]").

Depending on the evidence, there can be a fundamental threshold complexity in determining what land constitutes the parcel or parcels to be evaluated for just compensation purposes. To that end, courts are often tasked with determining whether a given parcel is part of a "larger parcel," which is "the whole property to be considered for compensation purposes." Yellow Book 110–11; J.D. Eaton, *Real Estate Valuation in Litigation* 76 (Appraisal Institute 2d ed. 1995) (noting that "[t]he larger parcel may be all of one parcel, part of a parcel, or several parcels").

The general rule is that "a parcel of land which has been used and treated as an entity shall be so considered in assessing compensation for the taking of part or all of it." *United*

31

*States v. Miller*, 317 U.S. 369, 376 (1943). More specifically, to determine whether a piece of property is part of a larger parcel, courts consider whether the parcels "possess a unity of ownership and have the same, or an integrated, highest and best use." Yellow Book 23; *see also id.* at 111 ("In determining the larger parcel, federal courts consider unity of use, unity of ownership (title), and physical unity (proximity or contiguity) as it relates to highest and best use[.]"); *see also Baetjer v. United States*, 143 F.2d 391, 394–95 (1st Cir. 1944) (considering "what constitutes a single tract as distinguished from separate ones. The answer does not depend upon artificial things like boundaries between tracts as established in deeds in the owner's chain of title, nor does it depend necessarily upon whether the owner acquired his land in one transaction or even at one time. Neither does it wholly depend upon whether holdings are physically contiguous. Contiguous tracts may be separate ones if used separately and tracts physically separated from one another may constitute a single tract if put to an integrated unitary use or even if the possibility of their being so combined in use in the reasonably near future is reasonably sufficient to affect market value. . . . Integrated use, not physical contiguity, therefore, is the test." (internal quotation marks and citations omitted)).

Parcels that do not meet this framework "must be considered as separate and distinct tracts for compensation and valuation purposes." Yellow Book 111; *see also id.* at 74 (directing that if "an appraiser determines that the highest and best use of a parcel is not the same as or similar to that of the other parcels to be included in the [appraisal] report, the unique parcel should be excluded from the project report and a separate narrative

32

appraisal report should be prepared for this unique parcel"); Eaton, *Real Estate Valuation in Litigation* 91 (same).

For instance, relying on these principles, the Fifth Circuit in *United States v. 8.41 Acres of Land*, 680 F.2d 388 (5th Cir. 1982), concluded that a condemned strip of land was not a separate parcel for just compensation purposes. There, the Department of Energy condemned property on three adjacent tracts of land for a pipeline easement. The tracts and surrounding area consisted of pastureland, a factory, and "[m]any of the world's largest chemical plants." *Id.* at 390. During the condemnation proceedings, the district court appointed a three-person commission to make findings on just compensation.

As the court explained, "[t]he normal procedure in awarding compensation for an easement is to determine the highest and best use of the entire acreage within the property lines of the parent tract and then calculate the difference between the market value of that tract before and after the taking." *Id.* at 390–91. Based on this method, the Government's valuation witness reasoned that the highest-and-best use for the tracts of land at issue was for industrial plant sites and "calculated the before-and-after value of the tracts on this basis." *Id.* at 391. In contrast, the landowners' valuation witnesses opined that the strip of condemned land should be treated "as a separate entity from the remaining acreage within the property lines of each tract," and that, as a result, "the highest and best use of the condemned strip of land [was] for pipeline right-of-way," which dictated "a dramatically higher compensation award." *Id.* The commission adopted the landowners' valuation method, and the district court subsequently approved the compensation award.

33

On appeal, the Government contended that the district court erred when adopting the landowners' valuation scheme, asserting that the condemned property was not a standalone parcel. The Fifth Circuit agreed. While the court recognized that "[w]hen an owner actually uses parts of what would otherwise constitute a unified tract for different or separate purposes, . . . the parts may be held to be functionally 'separate' tracts, though they are not physically separate" for purposes of determining compensation for the taking, it explained that was not what occurred in the case before it because the condemned strip of land was part of a single parcel:

> [T]he condemned strip of land had an integrated use with the parent tract-namely, pastureland. There was no evidence in the Commission's recommendations and findings that pipelines existed in the fifty-foot strip of land at issue. Neither did each condemned strip of land lie between existing pipelines . . . . The landowners had taken no steps to sever the condemned strips of land from the rest of the property. . . . The mere fact that the landowners hoped that these tracts would be acquired for pipeline purposes did not sever them from the rest of the land.

*Id.* at 393–94 (citations omitted). The court therefore concluded that the district court erred when characterizing the condemned property as a separate parcel for just compensation purposes.

Other courts have relied on similar principles when determining, for instance, that a condemnee was entitled to present evidence that the condemned property was part of a unitary tract when establishing just compensation, *United States v. 105.40 Acres of Land*, 471 F.2d 207, 209–12 (7th Cir. 1972); *Baetjer*, 143 F.2d at 395–96, and distinguishing part of a condemned tract that was "peculiarly valuable as geese and duck hunting grounds"

34

when discussing the complexity of the case for calculating the compensation award, *United States v. Chamberlain Wholesale Grocery Co.*, 226 F.2d 492, 493–94 (8th Cir. 1955).

While many of the above cases illustrating these principles involve a form of damages not at issue in this case—that is, severance damages, which compensates "the loss in value to the 'remainder tract' by reason of a partial taking of land," *105.40 Acres of Land*, 471 F.2d at 211 (citing *Sharpe v. United States*, 191 U.S. 341 (1903))—they nonetheless inform our analysis here because they convey basic rules in condemnation proceedings for determining whether Southgate Road should be considered part of the "larger parcel" of Columbia Pike and South Joyce Street for just compensation purposes. That is to say, if it is established on remand that Southgate Road shares an "integrated, highest and best use" with Columbia Pike and South Joyce Street, then it would likely be part of the sole "larger parcel." Yellow Book 110. And with the Government taking one "larger parcel" in the form of a singular interconnected roadway, the County would be entitled to one mode of just compensation.

If, however, it is determined on remand that Southgate Road is a valuable piece of severable development property, it could be classified as a separate and distinct tract from the "larger parcel" of Columbia Pike and South Joyce Street. In turn, such a finding would warrant a just compensation determination separate from the remaining property. In that circumstance, the court could hypothetically award fair market value to the County for Southgate Road, while directing that the Government provide substitute facilities to account for the taking of Columbia Pike and South Joyce Street. Such a hypothetical valuation scheme would not amount to impermissible hybrid compensation because it does

35

not involve mixing compensation methods for *a singular unit of property*. Rather, in such a scenario, each unit—Southgate Road separately and Columbia Pike and South Joyce Street in tandem—would receive its own form of compensation. *See United States v. 62.17 Acres of Land*, 538 F.2d 670, 676 (5th Cir. 1976) (explaining that courts "cannot permit a single payment for a double taking" nor "a double payment for a single taking"); *see also* J.A. 86 (the County agreeing with the district court's assessment that "if you have to look at this as *one entire project* . . . there's no case law . . . that supports the concept of hybrid compensation, that is, a combination of substitution of property plus cash" (emphasis added)).

Based on the foregoing, we are persuaded that the genuine disputes identified as to the nature of Southgate Road are also material. It is this contested distinction of the Southgate Road parcel that the district court overlooked when drawing inferences in favor of the Government, effectively determining as a decision *on the merits* that Southgate Road was not a separate parcel for condemnation purposes from the rest of the take. While the district court would not have committed procedural error by making that decision under Rule 71.1, it did err as such when resolving the case in a Rule 56 proceeding.

b.

The Government raises two primary arguments in response, one as to deed- and zoning-based limits on the use of Southgate Road and another as to the County's historic use of the property. In doing so, the Government challenges the materiality of the facts discussed above by contesting the County's ability to meet the requirements to invoke the highest-and-best-use principle, noting that the County's development plans must be

36

reasonably probable and not merely speculative. *See 69.1 Acres of Land*, 942 F.2d at 292 ("Where a landowner posits that a different use is 'highest and best,' he must show that this use is 'reasonably probable' and that the probability has a real market value."). This is because reasonable probability requires that the proposed use be one "for which the property is adaptable and needed or likely to be needed in the reasonably near future." *Olson*, 292 U.S. at 255. We find neither of the Government's arguments on this point determinative at the summary judgment stage based on the record evidence.

i.

Along the lines of the parcel's adaptability for development, the Government first asserts that the County's concept for Southgate Road's development cannot be realized because it would violate a deed-based encumbrance that requires Southgate Road to be used as a public right-of-way and would violate local zoning ordinances that prohibit mass residential development. But the record contains sufficient contradictory evidence that would bar a reasonable factfinder from concluding as undisputed fact for Rule 56 purposes that these possible limitations would clearly thwart the County's proposed development plans.

Starting with the Government's argument as to a deed-based restriction, the County provided sufficient record evidence from which a reasonable factfinder could conclude that a public right-of-way limitation does not encumber Southgate Road. Although the 1956 deed appears to require that Southgate Road be used "to maintain the project constructed thereon," J.A. 549—which is presumably a reference to Southgate Road's "use [being] in connection with the construction of the Navy Annex Access Road, Defense Access Project

37

DA-NR-39" (as discussed earlier in the deed), J.A. 546—"[t]he title report to the property [did] not indicate that there [was] any such exception to title," J.A. 688. Indeed, the parties stipulated, "Prior to the Date of Taking, [the County] owned the condemned portion[] of the Southgate Road Parcel . . . in fee simple." J.A. 179. Timothy O'Hora, the Deputy Chief of the Real Estate Bureau of the Arlington County Department of Environmental Services, further explained the County's ownership of Southgate Road, relaying that it held the parcel "in fee simple and not restricted to road uses only or subject to any other title restrictions, except for a utility easement. Though it historically has allowed public access, Southgate Road is not a dedicated public right-of-way." J.A. 688; *see also* J.A. 131 (the County representing that it "was deeded [Southgate Road] in fee simple without conditions, without any restrictions on it, and the County can dispose of that property as it wants"). Based on the foregoing, a reasonable factfinder could conclude that the County's ownership of Southgate Road was unrestricted by deed encumbrances of record. And, at any rate, a reasonable factfinder could determine that even if such a restriction did exist, it would not necessarily limit Southgate Road's development because, as the County represents, "redevelopment of the Southgate Parcel can accommodate a throughway for public use." Reply Br. 17.

Turning to the Government's zoning claim, we are also satisfied that the County presented sufficient evidence for a reasonable factfinder to determine that Southgate Road's zoning designation did not render the County's development plans speculative as a matter of law or uncontested fact. The parties stipulated that, "[a]t the Date of Taking, the Southgate Road Parcel was zoned S-3A under the Arlington County Zoning Ordinance."

38

J.A. 181. Admittedly, this designation "is very restrictive, and its permitted uses promote low-density housing or government/institutional uses. Historically, there has not been a demonstrated market of sellers and buyers for land zoned S-3A. Most of the uses permitted by the S-3A district are non-economic uses that are not sought by the private sector." J.A. 276. However, Southgate Road could be "desirable to the private sector if the land is re-planned and rezoned for residential use." J.A. 300.

The record reflects that such re-planning and rezoning could be "reasonably probable" to occur because the County is the decision-making authority on such matters. As the parties stipulated, "[t]he Arlington County Board makes final decisions on rezoning and re-planning of real property in Arlington County." J.A. 182. As VanHorn opined:

> [I]t is reasonable to expect that Arlington County would approve a rezoning and general land use plan amendment to allow for residential development at the Southgate Parcel. Arlington County's prepared development plans for the Southgate Parcel fit within zoning categories that match other low-density areas in the County, thereby ensuring ease of zoning for a townhome developer. Such rezoning also conforms with the adjacent Foxcroft Heights neighborhood and extends that same character and type of housing along the Southgate Parcel. In my experience, these types of rezoning requests are common with development projects and the current zoning would not present a substantial concern to a real estate developer. . . . My opinion on the likelihood of rezoning is further strengthened by my understanding that the County owned the Southgate Parcel in fee simple.

J.A. 337; *see also* J.A. 605–06 (Leach explaining that he was "aware that the County has owned other properties in fee simple that were zoned for public use or used as undedicated roadways, and has rezoned and sold such properties for more productive uses such as residential"). Thus, we are persuaded that there is sufficient evidence from which a reasonable factfinder could determine that Southgate Road's zoning designation at the time

39

of the taking was not dispositive of the County's ability to pursue development. *See* Yellow

Book 108 ("For any use that requires a permit, license, or rezoning, 'it must be shown that

there is a reasonable probability that such permit or license will be issued or that a re-

zoning will occur to make the use legal.'" (quoting *United States v. 480.00 Acres of Land*,

557 F.3d 1297, 1300 (11th Cir. 2009))).

ii.

In its second argument aimed at challenging the reasonable probability of the

County's development plans, the Government argues that inferring the County would (or

could) implement its plans for Southgate Road is not a reasonable interpretation of the

record evidence because the County has only ever utilized the parcel as a road:

> For more than 50 years before the taking, the County used Southgate Road
> as a public right of way for vehicular, bicycle, and pedestrian travel, and for
> utilities and parking. The County never sought to sell Southgate Road. Nor
> did the County attempt to put Southgate Road to some use other than as a
> public right of way and parking facility. Outside of this litigation, the County
> never discussed or explored putting a residential development on Southgate
> Road. No developer ever approached the County about developing the
> Southgate Road Parcel.

Resp. Br. 15 (internal citations omitted). The district court expressed similar sentiments,

remarking that

> it is interesting that the Southgate Road and the area around it, which I think
> has only been used for parking, has been in that configuration for 40 or 50
> years at least, so . . . that particular area of Arlington County hasn't been used
> for anything else for years. And it's quite inchoate as to whether or not
> [Southgate Road] would ever really be developed into residential property[.]

J.A. 110.

40

This view fails to account for the County's evidence on summary judgment. First, there is competent record evidence explaining that the County made no efforts to develop Southgate Road in the decades leading up to the underlying litigation at least in part because of the Project. In fact, Leach consistently confirmed that Southgate Road is "kind of frozen in time because of the land exchange agreement and the . . . Project." J.A. 431; *see also* J.A. 427 ("[Leach]: [The Southgate Road] area was essentially frozen for a number of years because of the land exchange. Without the possibility of a land exchange, that whole section of Southgate Road could have been redesigned for better pedestrian facilities, better bike facilities, open-space development as proposed, but it wasn't because of the potential land exchange. So I think we could have put 4.23 acres to really good use. [Q]: So but for the land exchange, the county would have taken steps to improve the Southgate Road parcel? [Leach]: I . . . believe that's true. Land is incredibly valuable. We're a very small county and, you know, every . . . square acre is valuable."); J.A. 605 (Leach indicating that "[a]s a result of the lengthy land exchange agreements that date back to the early 2000s, the Southgate Parcel is underutilized and has essentially been frozen in time").

Drawing all reasonable inferences in the County's favor, as we are constrained to do under the summary judgment standard, leads us to conclude that a reasonable factfinder could determine that the stagnant status of Southgate Road was caused in part by the Project, not by the County's unwillingness or inability to recognize the parcel's full potential. *See California*, 395 F.2d at 267 n.17 ("It would be anomalous indeed if the United States could successfully assert that the present value of vacant State lands is

41

diminished by the burden imposed by a dedication of the lands to future public uses not yet being served, and at the same time deny the State the benefit of enhancement of present value based upon the potential profitability of those uses on the ground that the lands had not been put to these uses at the time of taking.").

The Government's argument also misinterprets the law on this point because Southgate Road's function for purposes of determining just compensation need not be anchored to its use at the time of the taking, nor must the County necessarily have "plans to sell the property or utilize it for [the proposed] use." *Prince William Cnty.*, 276 F.3d at 1366 (internal quotation marks and citation omitted). That is the point of the highest-and-best-use principle, which, as discussed above, simply requires that the County demonstrate that the proposed use "is 'reasonably probable' and that the probability has a real market value." *69.1 Acres of Land*, 942 F.2d at 292. In turn, reasonable probability requires that the use be one "for which the property is adaptable and needed or likely to be needed in the reasonably near future." *Olson*, 292 U.S. at 255.

Having already discussed Southgate Road's adaptability to the County's proffered plans for development, we now briefly consider the remaining inquiry: whether there is a reasonable probability of demand for Southgate Road as a developable piece of property. The record contains sufficient evidence of such demand on which a reasonable factfinder could rely.

As the County's appraisal indicated, Southgate Road would be "desirable to the private sector if the land is re-planned and rezoned for residential use." J.A. 300. The record reflects the considerable demand for townhomes within the County, which will only

42

increase as Amazon constructs a new headquarters in the area. J.A. 287 ("Amazon's presence will add considerably to housing demand in the local area and be particularly advantageous to the subject site, which is 1 mile away."); J.A. 335 (VanHorn relaying that "pricing indicates that there is significant demand for [townhome development], which remains a discount to new single family housing in Arlington County"); J.A. 334 ("Townhome supply in Arlington is extremely limited while the townhome product is one of the most desirable housing products in Arlington due to the size and price point for buyers."). Sufficient demand for the residential development of Southgate Road is therefore evident from the record. *See 69.1 Acres of Land*, 942 F.2d at 294 ("[T]he landowner does not have to show an imminent demand for the . . . property. He just has to show that there is a reasonable probability that the [property] will be needed and wanted at a near enough point in the future to affect the current value of [it].").

At bottom, the County has demonstrated sufficient evidence as to development plans for Southgate Road to illustrate that road's separate and distinct utility from Columbia Pike and South Joyce Street, thereby precluding summary judgment in favor of the Government. *See California*, 395 F.2d at 267 ("Whatever standard is used, the equitable principles underlying just compensation require that any profitable uses of the lands . . . must be considered in determining the fact of loss and in calculating its monetary equivalent.").[16]

---

[16] Having concluded that summary judgment was improper given the genuine dispute of material fact as to the divisibility of Southgate Road from Columbia Pike and South Joyce Road for just compensation purposes, we provide no opinion on the district

43

\* \* \* \*

Although this case presents both novel and complex issues, the district court fundamentally failed to observe the Rule 56 summary judgment standard when it

> erred by failing to consider all of the evidence in the record. The district court[] . . . also state[d] the facts in the light most favorable to the [Government]—not [the County], the nonmovant. Strikingly, . . . the district court's key factual findings . . . rest on factual inferences contrary to [the County's] competent evidence. The district court thus improperly resolved factual issues at the summary judgment stage, in contravention of well-settled law.

*Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 569 (4th Cir. 2015); *accord Tolan v. Cotton*, 572 U.S. 650, 657 (2014) ("By failing to credit evidence that contradicted some of its key factual conclusions, the court improperly weighed the evidence and resolved disputed issues in favor of the moving party." (cleaned up)); *see also Johnson v. Ross*, 419 F. App'x 357, 361 (4th Cir. 2011) (unpublished opinion) (characterizing fact-finding at the summary judgment stage as a "rare scenario"). Even in the condemnation context, "a motion designed simply for identifying trial-worthy issues" cannot devolve into "a vehicle for resolving trial-worthy issues." *Jacobs*, 780 F.3d at 569 n.8 (quoting Arthur R. Miller, *Simplified Pleading, Meaningful Days in Court, and Trials on the Merits: Reflections on the Deformation of Federal Procedure*, 88 N.Y.U. L. Rev. 286, 312 (2013)); *see also* 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (4th ed. 2022) ("Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits.").

---

court's dependent finding—that "the substitute facilities will provide . . . just compensation for the taking of the Southgate Road." J.A. 108–10.

44

Our review under the summary judgment standard has demonstrated that, when viewing this case in the light most favorable to the County, there is sufficient evidence from which a reasonable factfinder could conclude that Southgate Road is a separate and distinct parcel from Columbia Pike and South Joyce Street that is entitled to an independent just compensation determination. The district court therefore erred in making findings to the contrary and granting summary judgment in favor of the Government. This error mandates vacatur and remand even if there is a "likelihood" that "the judge we are reversing will be the trier of fact on remand [under Rule 71.1] and will use [her] factfinding discretion to reinstate the judgment that we have reversed." *Brotherhood Shipping Co. v. St. Paul Fire & Marine Ins. Co.*, 985 F.2d 323, 326 (7th Cir. 1993). Notwithstanding the unique judicial posture of this case, remand is thus appropriate so that the district court may resolve the genuine disputes of material fact pursuant to its authority under Rule 71.1.

III.

For the reasons discussed above, the judgment of the district court is

*VACATED AND REMANDED.*

45

RUSHING, Circuit Judge, concurring in the judgment:

The district court in this case erred when it resolved factual disputes at a summary judgment hearing, contrary to Rule 56 of the Federal Rules of Civil Procedure. A district court ruling on summary judgment determines only whether disputes of material fact exist; it may not resolve those disputes, which are reserved for the factfinder at trial. But in a federal condemnation proceeding, the district court *is* the factfinder on "all issues" except the discrete question of the amount of compensation. Fed. R. Civ. P. 71.1(h). So, in this unique context, the district court's error appears to be one of mere labeling. As the Court today acknowledges, the district court judge is entitled on remand to make the same factual findings under Rule 71.1 that she erroneously made under Rule 56. *See supra*, at 28, 30 n.14, 36, 45.

In a federal condemnation proceeding, Rule 71.1 tasks the district court judge with "decid[ing] all issues, legal and factual," except for "the precise issue of the amount of compensation to be awarded." *United States v. Reynolds*, 397 U.S. 14, 19–20 (1970); *see* Fed. R. Civ. P. 71.1(h)(1). If a jury is requested, then the jury or an appointed commission determines the amount of compensation; otherwise, the judge may decide that issue as well. Fed. R. Civ. P. 71(h)(1). Thus, a federal condemnation case typically proceeds in multiple steps, with the judge deciding all "preliminary matter[s]" before a jury or commission is called upon to determine the amount of compensation within the "ground rules" established by the judge. *Reynolds*, 397 U.S. at 20. In the present case, the analysis proceeds in three steps: First, the scope and character of the project must be defined; second, the form of

compensation—whether fair market value or substitute facilities—must be determined; and third, the amount of just compensation must be calculated.

Before the district court, the Government and the County both correctly treated the first two questions—the scope of the project and the form of compensation—as matters for the judge to decide. The third issue—amount of compensation—was reserved for the jury that the County had requested. But both parties agree that, after the district court resolved the first two questions in favor of the Government, there was no longer a dispute of material fact on the third issue and no longer any need for a jury. This is because the County conceded that the substitute facilities offered by the Government were functionally equivalent to the facilities taken and therefore qualified as just compensation for purposes of the substitute facilities doctrine. *See supra*, at 27 n.12 (noting County's concession); *see also Town of Clarksville v. United States*, 198 F.2d 238, 242–243 (4th Cir. 1952) (explaining the "equivalence requirement [that] must be met with respect to the substitute facility").

The upshot is that, had the district court judge proceeded under Rule 71.1 rather than Rule 56 when making these factual findings, she would have been acting within her rightful authority to resolve this case. This is not a situation where the judge has usurped the jury's factfinding role. Nor does the County contend that further record development was necessary before the judge could make these decisions or that it was prejudiced by the judge ruling at this particular time instead of at some later point.

Rather, the County's arguments on appeal (and those of the Government) focus on the merits of the district court's decision. But the Court's ruling today is procedural—it

47

does not identify any error in the district court's substantive analysis or criticize the district court's reasoning. And while the Court endeavors to provide guidance on principles of federal condemnation law, it acknowledges that not all of its discussion is directly on point for the questions presented by this case, although the district court may yet find that discussion helpful by analogy. *See, e.g., supra*, at 20–24 (acknowledging a distinction between substitute facilities as a measure of compensation and a form of compensation); *supra*, at 30–36 (examining partial takings caselaw and the severance damage rule, which the Court observes are not at issue in this case); *supra*, at 36–43 (discussing the parties' factual dispute regarding the highest and best use of the Southgate Road parcel, which is a principle more relevant to the amount of compensation than the form).

In sum, I agree with my colleagues that the district court erred by granting summary judgment when material facts were in dispute. *See supra*, at 15, 24–25, 36, 45. And I agree that this error appears to be one the district court can remedy on remand by applying the correct label to her ruling—that of Rule 71.1, which authorizes district courts to make factual findings, instead of Rule 56, which forbids it.